NOT YET SCHEDULED FOR ORAL ARGUMENT

—————————

Nos. 13-7082, 13-7090, 13-7101, 13-7111

—————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————

DAVID HARVEY,
APPELLEE & CROSS-APPELLANT,

v.

DISTRICT OF COLUMBIA,
APPELLANT & CROSS-APPELLEE.

—————————

ON APPEALS FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

—————————

**BRIEF FOR APPELLANT DISTRICT OF COLUMBIA**

—————————

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

CARL J. SCHIFFERLE
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6624
carl.schifferle@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—David Harvey, individually and as personal representative of the estate of Curtis Suggs, was the plaintiff below and is appellee/cross-appellant here.  The District of Columbia was a defendant below and is appellant/cross-appellee here.  Leon Mohammed, Yvonne Mohammed, and Symbral Foundation for Community Service, Inc. were defendants below but settled with Mr. Harvey.  (Dkt.191.)  Donald Egbuonu, M.D., was also named as a defendant and is appellee here.  There are no amici.

B. *Ruling under review*.—The District appeals from the following rulings in the district court (Lamberth, J.): the judgment entered on August 16, 2012 (Dkt.249) and the memorandum opinion and order of April 24, 2013 (Dkt.290, Dkt.291) denying the District's motion for a new trial or in the alternative for remittitur, and any and all orders merged into the foregoing.  Mr. Harvey cross-appeals from the March 22, 2012 pretrial order (Dkt.196) striking certain claims.  The District separately appeals, and Mr. Harvey cross-appeals, from the memorandum opinion and order of June 26, 2013(Dkt.300, Dkt.301) granting in part and denying in part Mr. Harvey's motion for attorneys' fees and costs.

C. *Related cases*.—This case has not been before this Court or any other court other than the district court below.  Undersigned counsel is unaware of any related cases pending in this Court or any other court.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES ...............................................................1

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS .........................................................................3

    1.    Factual Background.......................................................................3

        a.    Mr. Suggs's condition, and care by a District contractor, subject to District officials' oversight and inspection................3

        b.    Mr. Suggs's physical decline late in life. ...................................8

        c.    Additional evidence. ...................................................14

            (i)    Mary Devasia.................................................14

            (ii)    Expert testimony. ...........................................15

            (iii)    System-wide issues..........................................15

    2.    Procedural Background. ................................................................17

        a.    Summary judgment.....................................................17

        b.    Pretrial rulings.........................................................21

            (i)    Causation. ..................................................21

            (ii)    Dr. Gersh....................................................22

            (iii)    Pressure sores................................................23

        c.    Trial.................................................................24

            (i)    Proximate cause instruction....................................24

            (ii)    Probate lien. ................................................25

d.    The District's cross-claim for contribution. .............................26

e.    New trial motion. .................................................................27

STANDARD OF REVIEW ...................................................................27

SUMMARY OF ARGUMENT ..............................................................28

ARGUMENT .......................................................................................31

I.    The District, Not Mr. Harvey, Was Entitled To Summary Judgment. ...................................................................................31

A.    The District was entitled to summary judgment on the Fifth Amendment claim. ....................................................31

1.    The Fifth Amendment claim fails for lack of a "special relationship." .....................................................31

2.    Even assuming a special relationship, the evidence is insufficient to show deliberate indifference rising to a constitutional violation. ..............................................34

3.    Even assuming an underlying constitutional violation, the evidence was insufficient to show a District policy...............................................................39

4.    Alternatively, a jury must decide the claim. ...................43

B.    The District was entitled to summary judgment on the negligence and statutory claims. ...............................................44

1.    D.C. Code § 12-309 bars the claims. ..............................44

2.    Even if D.C. Code § 12-309 is not a bar, the statutory claim fails for the same reasons as the Fifth Amendment claim...........................................................46

3.    Alternatively, a jury must decide the claims. .................47

II.    Even If Summary Judgment For Mr. Harvey Were Proper, The District Is Entitled To A New Trial On Damages...............................50

iii

A.   The district court abused its discretion in excluding the District's evidence contesting causation. ...................................50

1.   Decision against the laminectomy. .................................50

2.   Pre-existing conditions. ..................................................52

3.   Dr. Gersh. .......................................................................53

4.   Pressure sores. ................................................................53

B.   The district court abused its discretion in instructing the jury on the District's probate lien. .............................................54

III.   The District Court Misapplied The District's Entitlement to Contribution. ...........................................................................57

CONCLUSION ...................................................................................59

# TABLE OF AUTHORITIES*

*Cases*

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ....................... 31, 39

*Barnhardt v. District of Columbia*, 8 A.3d 1206 (D.C. 2010) .................................44

*Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43 (D.C. Cir. 2011) .........................50

*Briggs v. WMATA*, 481 F.3d 839 (D.C. Cir. 2007).....................................................47

*\*Brooks v. Cook*, 938 F.2d 1048 (9th Cir. 1991).......................................................56

*Brown v. District of Columbia*, 514 F.3d 1279 (D.C. Cir. 2008) ............................36

*\*Brown v. District of Columbia*, 853 A.2d 733 (D.C. 2004) ...................... 44, 45, 46

*\*Caudle v. District of Columbia*, 707 F.3d 354 (D.C. Cir. 2013) .................... 56, 57

*City of Canton v. Harris*, 489 U.S. 378 (1989)........................................................40

*Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23 (1st Cir. 1998)...................52

*\*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ............32

*\*District of Columbia v. Dunmore*, 662 A.2d 1356 (D.C. 1995)............................45

*Doe by Fein v. District of Columbia*, 697 A.2d 23 (D.C. 1997).............................46

*\*Dorman v. District of Columbia*, 888 F.2d 159 (D.C. Cir. 1989). ........................43

*\*Estate of Kurstin v. Lordan*, 25 A.3d 54 (D.C. 2011) ..................................... 57, 58

*\*Estate of Phillips v. District of Columbia*, 455 F.3d 397 (D.C. Cir. 2006) ...................................................................................... 31, 32, 34

---

*        Authorities upon which we chiefly rely are marked with asterisks.

*Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978) ................................ 4, 32, 42

*Evans v. Williams*, 139 F. Supp. 2d 79 (D.D.C. 2000) .............................................17

*Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000) ...................................... 5, 15, 41

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................34

*Franklin v. District of Columbia*, 163 F.3d 625 (D.C. Cir. 1998) ........................43

*Harris v. District of Columbia*, 932 F.2d 10 (D.C. Cir. 1991) ..............................33

*Horne v. Flores*, 557 U.S. 433 (2009) ......................................................................42

*Hubbard v. Chidel*, 790 A.2d 558 (D.C. 2002) .......................................................28

*In re Subpoena Duces Tecum*, 439 F.3d 740 (D.C. Cir. 2006) ................................28

*Johnson v. District of Columbia*, No. 11-5115 (D.C. Cir. Nov. 15, 2013)..............40

*Jones v. AMTRAK*, 942 A.2d 1103 (D.C. 2008).......................................................49

*Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) .................................................. 40, 43

*McGee v. Adams*, 721 F.3d 474 (7th Cir. 2013) .......................................................36

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ................................................39

*Moore & Hill, Inc. v. Breuninger*, 34 App. D.C. 86 (D.C. Cir. 1909) ....................55

*Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) ........................................28

*Owens v. District of Columbia*, 993 A.2d 1085 (D.C. 2010) ....................................46

*Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619 (D.C. 1986) .....................55

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133 (2000) ..........................52

*Reiser v. District of Columbia*, 563 F.2d 462 (D.C. Cir. 1977) ...............................54

vi

*Schleier v. Kaiser Found. Health Plan*, 876 F.2d 174 (D.C. Cir. 1989) .................55

*Siggers v. Barlow*, 906 F.2d 241 (6th Cir. 1990).......................................................54

*Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005)....................................33

*Speights v. 800 Water St., Inc.*, 4 A.3d 471 (D.C. 2010).........................................47

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997)...........................39

*United States v. Project on Gov't Oversight*, 616 F.3d 544 (D.C. Cir. 2010) .........47

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013)...............................................28

*\*Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (en banc)...............................34

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ...................................................... 32, 42

## Statutes

28 U.S.C. § 1331 .........................................................................................................1

28 U.S.C. § 1367 .........................................................................................................1

42 U.S.C. § 1983.............................................................................. 1, 20, 47, 58, 59

42 U.S.C. § 1988.........................................................................................................3

Act of Oct. 22, 1970, Pub. L. No. 91-490, 84 Stat. 1087 .........................................4

D.C. Code § 7-1301.02 ....................................................................................... 4, 5, 40

D.C. Code § 7-1301.03 ...............................................................................................6

D.C. Code § 7-1303.07 .............................................................................................34

D.C. Code § 7-1303.08 .............................................................................................34

D.C. Code § 7-1303.11 ........................................................................................ 25, 54

D.C. Code § 7-1304.02 ...................................................................40

D.C. Code § 7-1304.11 ................................................................7, 40

D.C. Code § 7-1305.03 ...................................................................33

D.C. Code § 7-1305.04 ................................................................6, 40

D.C. Code § 7-1305.05 ....................................... 5, 20, 33, 40, 46, 58

D.C. Code § 7-1305.13 ................................................................5, 40

D.C. Code § 7-1305.14 ......................................................... 2, 5, 46, 47

D.C. Code § 12-309 ............................................... 18, 20, 44, 45, 46, 58

D.C. Code § 21-1101 (1967)............................................................4

D.C. Code § 21-2210 .....................................................................38

D.C. Code § 44-501 .......................................................................41

## Regulations

22B D.C.M.R. ch. 35 .................................................................8, 41

22B D.C.M.R. § 3517 .....................................................................41

22B D.C.M.R. § 3520 .............................................................. 6, 7, 41

22B D.C.M.R. § 3521 ...................................................................7, 41

42 C.F.R. § 483 subpt. I ................................................................8

## Rules

Fed. R. Civ. P. 26...................................................... 22, 27, 53

Fed. R. Civ. P. 37.......................................................................53

Fed. R. Civ. P. 86 ................................................................................53

Super. Ct. Ment. Ret. R. 7, 15 .............................................................7

## Other Authorities

Restatement (Second) of Torts § 452 (1965) .........................................54

# GLOSSARY

| | |
|---|---|
| Act | Citizens with Intellectual Disabilities Constitutional Rights and Dignity Act of 1978, D.C. Law 2-137 |
| IHP | Individual Habilitation Plan |
| QMRP | Qualified Mental Retardation Professional |
| Rule | Federal Rule of Civil Procedure |
| Team | Interdisciplinary Team |

# JURISDICTIONAL STATEMENT

The plaintiff, David Harvey, brought this suit as the personal representative of the estate of Curtis Suggs, claiming a violation of Mr. Suggs's Fifth Amendment rights, under 42 U.S.C. § 1983, and other violations of federal and District of Columbia law. (Compl.) The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. On April 24, 2013, the court denied the defendant District of Columbia's post-trial motion. (Dkt.290.) The District timely appealed on May 20, 2013. (No. 13-7082.) On June 26, 2013, the district court partially granted Mr. Harvey's motion for attorneys' fees and costs. (Dkt. 300.) The District filed another notice of appeal two days later. (No. 13-7101.)

# STATEMENT OF THE ISSUES

1. Whether the District, not Mr. Harvey, was entitled to summary judgment on his Fifth Amendment substantive due process claim, where no special relationship existed between the District and Mr. Suggs and where the evidence was insufficient to show both a constitutional violation by a District official and a District policy causing that violation; alternatively, whether a jury trial was required to decide this claim.

2. Whether the District, not Mr. Harvey, was entitled to summary judgment on his negligence and local statutory claims, where notice of the claims was not proper or timely; alternatively, whether a jury trial was required because the evidence did not establish negligence as a matter of law.

3.  Even if properly held liable, whether the District is entitled to a new trial on damages where the court erroneously and prejudicially excluded the District's evidence on causation before submitting the issue of proximate cause to the jury, and where the court gave an improper instruction and permitted improper argument, resulting in a verdict that penalized the District for seeking a probate lien.

4.  Whether the district court erroneously denied the District equal contribution from a co-defendant found to be a joint tortfeasor.

## STATEMENT OF THE CASE

Mr. Harvey brought this suit for damages against the Symbral Foundation for Community Services, Inc. ("Symbral"), a non-profit corporation that operated the residential care home where Mr. Suggs resided; Symbral's owners, Leon and Yvonne Mohammed ("the Mohammeds"); and the District of Columbia.  (Compl.)[1]  The complaint alleged that Mr. Suggs suffered neglect during his residence with Symbral, which caused a decline in his health and ultimately his death on June 30, 2000. (Compl. 2.)  The court decided liability as a matter of law, awarding summary judgment to Mr. Harvey on his Fifth Amendment claim against the District, his negligence claims against the District, Symbral, and the Mohammeds; and his claim against the District under D.C. Code § 7-1305.14(c).  (Dkt.164, Dkt.196.)  Symbral

---

[1]     The complaint alleged claims against another defendant, Dr. Donald Egbuonu, that were dismissed for failure to prosecute.  (Pretrial Order 17.)

and the Mohammeds settled with Mr. Harvey before a trial on damages.  At trial, with the District as the only remaining defendant, a jury awarded Mr. Harvey $2.9 million in compensatory damages.  (Dkt.241.)  After resolving the District's cross-claim for contribution, the district court entered judgment against the District for $2.65 million.  (Dkt. 249.)  The court denied the District's motion for a new trial.  (Dkt.290.)  It later awarded Mr. Harvey roughly $1.2 million in attorneys' fees and costs under 42 U.S.C. § 1988.  (Dkt.300.)

## STATEMENT OF FACTS

### 1.    Factual Background.

The following facts were undisputed on summary judgment, unless otherwise noted.

#### a.    Mr. Suggs's condition, and care by a District contractor, subject to District officials' oversight and inspection.

Mr. Suggs was born in 1932 and eventually diagnosed with cerebral palsy, profound mental retardation, seizure disorder, and scoliosis.  (Dkt.150-6, MR149-50.)  He started to walk around age 12 and later learned to feed and clean himself.  (Dkt.150-5, Dep. 7.)  Mr. Suggs communicated through signs and vocal sounds.  (Dkt.150-5, Dep. 7-8.)  In 1963, around when his parents died, he began living with his sister, Carrie Weaver.  (Dkt.150-5, Dep. 10-11.)

No longer able to care for him, Ms. Weaver applied to commit Mr. Suggs in 1967.  (Dkt.123-1 at 7.)  The district court adjudged him a "feeble-minded person who

requires supervision, control, and care" and committed him "to the District Training School as a public patient." (Dkt.128-2 at 11); *see* D.C. Code § 21-1101 *et seq.* (1967). The District Training School soon became known as Forest Haven. *See* Act of Oct. 22, 1970, Pub. L. No. 91-490, § 1(1), 84 Stat. 1087, 1087.

In 1976, a class action lawsuit was filed on behalf of Forest Haven residents. *See Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978). Two years later, the district court entered a consent order declaring that Forest Haven residents had a Fifth Amendment right to "receive habilitative care and treatment in [a setting] least restrictive of individual liberty and to be kept free from harm." *Id.* at 484. The consent order included extensive permanent injunctive relief, requiring the District to "deinstitutionaliz[e] class members" by closing Forest Haven and placing them in "community living arrangements." *Id.* at 485-87. The order also imposed a series of requirements governing the living arrangements, programs, and services for the plaintiff class. *Id.* at 485-90. Pursuant to the order, the District retained a Court Monitor to assist in the order's implementation. *Id.* at 485-86.

In 1979, the Council of the District of Columbia enacted the Citizens with Intellectual Disabilities Constitutional Rights and Dignity Act of 1978 ("Act"), D.C. Law 2-137 (codified as amended at D.C. Code § 7-1301.02 *et seq.*), to assure that all intellectually disabled citizens would enjoy their full "civil and legal rights"; to provide each such resident, "regardless of ability to pay, such habilitation as will be

4

suited to [his] needs . . . in a setting least restrictive of personal liberty"; and to "[m]aximize the assimilation of persons with intellectual disabilities into the ordinary life of the community." D.C. Code § 7-1301.02(a). The Act established procedures for admission to and discharge from facilities and programs; procedures for hearings and review proceedings; and specific rights of persons with intellectual disabilities, including the right to "prompt and adequate medical attention for any physical ailments." D.C. Code § 7-1305.05(g). The Act also provided for judicial enforcement of these rights. D.C. Code §§ 7-1305.13-.14.

In 1983, the district court in *Evans* entered another consent order that "govern[ed] almost every aspect of the District's treatment of the [intellectually disabled]." *Evans v. Williams*, 206 F.3d 1292, 1293 (D.C. Cir. 2000).

In 1984, Mr. Suggs became one of four residents at a home on Blair Road, where he would reside until his death in June 2000. (Dkt.120-3 at 14-15 ¶¶ 2, 4.) The home was a licensed "intermediate care facility for the mentally retarded." (*Id.* ¶¶ 2-3.) Symbral operated the home and, through annual contracts with the District, agreed to provide room, board, and services to the residents. (*Id.* ¶ 3.) It employed two direct care staff on duty at all times, supervised by a house manager and a residential services coordinator. (*Id.* ¶ 4.) Symbral also employed a registered nurse and a qualified mental retardation professional ("QMRP") "who had overall responsibility

for the coordination of services and care to residents." (*Id.* ¶ 4); *see* D.C. Code § 7-1301.03(21) (establishing qualification requirements for QMRPs).

As part of its responsibilities, Symbral retained a primary care physician for Mr. Suggs. (Dkt.120-3 at 15 ¶ 5.) It also contracted with other professionals, including physical therapists, occupational therapists, psychologists, nutritionists, dentists, and podiatrists to provide services to residents, including Mr. Suggs, on a regular basis. (Dkt.120-3 at 16 ¶ 6); *see* 22B D.C.M.R. § 3520.

While residing at the home, Mr. Suggs attended a day program operated by United Cerebral Palsy through a contract with the District. (Dkt.150-6, MR353-54.) He received habilitation services there each weekday. (Dkt.120-3 at 16 ¶ 9.)

An interdisciplinary team ("team") monitored Mr. Suggs's care. (*Id.* ¶ 10.) It met annually to prepare an Individual Habilitation Plan ("IHP") assessing his needs and specifying objectives and goals. (Dkt.128-6, Dep. 286-88); *see* D.C. Code §§ 7-1304.03(c), 7-1305.04. The IHP was based on a comprehensive evaluation of Mr. Suggs by appropriate professionals retained by Symbral. (Dkt.128-6, Dep. 286-88); *see* D.C. Code §§ 7-1301.03(6), 7-1304.03, 7-1305.04. His team included these professionals, Symbral's QMRP and nurse, and his court-appointed attorney. (Dkt.128-8, Dep. 36-38); *see* D.C. Code § 7-1304.03(c). Ms. Weaver was also invited to participate. (*E.g.*, Dkt.150-6, MR149.) Symbral's QMRP compiled the professionals' evaluations, convened the meeting, and took minutes. (Dkt.128-7 at 9.)

6

Symbral was responsible for producing the written IHP and ensuring its implementation. (Dkt.128-6, Dep. 22-23, 74; Dkt.128-7, Dep. 74-75; Dkt.128-8, Dep. 73-74.); *see* 22B D.C.M.R. §§ 3517.10-.12, 3521.6. Symbral's responsibility included securing appropriate medical services and appointments. (Dkt.128-6, Dep. 22-23; Dkt.128-7, Dep. 95-98; Dkt.139-9, Dep. 100); *see* 22B D.C.M.R. § 3520.

The District's Mental Retardation and Developmental Disabilities Administration assigned Mr. Suggs a case manager. Employed by the District, the case manager not only attended his team meetings but also, by policy, visited him at least quarterly to verify his receipt of IHP-recommended services. (Dkt.128-6, Dep. 18; Dkt.120-3 at 16 ¶ 7.) If concerned that a recommendation was not being followed, the case manger would report "mainly orally" to the home. (Dkt.128-8, Dep. 24.)

At least annually, the Superior Court of the District of Columbia conducted review hearings for Mr. Suggs. *See* D.C. Code § 7-1304.11(a). The Superior Court received Mr. Suggs's current IHP before the hearings and issued findings of fact and conclusions of law afterwards. *See* Super. Ct. Ment. Ret. R. 7, 15. His court-appointed attorney would report to the court if his IHP recommendations were not being followed. (Dkt.139-7, Dep. 70.)

The District's Health Regulation Administration also performed annual inspections of the home for compliance with federal standards and District licensing requirements. (Dkt.120-3 at 15 ¶ 3; Dkt.123-1 at 12; Dkt.129-15 at 6, 9); *see* 42

7

C.F.R. § 483 subpt. I; 22B D.C.M.R. ch. 35.  The inspections were unannounced. (Dkt.128-12, Dep. 26.)   District inspectors observed residents, reviewed records (Dkt.128-12, Dep. 47-48), and verified that the home was implementing the residents' IHPs.  (Dkt. 129-15, Dep. 133.)  If deficiencies were found, the inspector would issue a report and then the home had to provide a specific, written correction plan within 10 days.  (Dkt.129-2 at 4.)  Inspectors would re-visit the home to confirm that the home had made the corrections.  (Dkt.129-15, Dep. 170; Dkt.131-12 at 2-3.)

> **b.     Mr. Suggs's physical decline late in life.**

Until she moved to South Carolina in 1991, Ms. Weaver would take Mr. Suggs to her home and "keep him two and three days at a time" over the holidays and through the summertime.  (Dkt.150-5, Dep. 13.)  She saw his condition gradually begin to worsen around 1987, when he could no longer walk or climb stairs unassisted.  (Dkt.150-5, Dep. 25.)

In September 1995, a physical therapist at United Cerebral Palsy wrote that Mr. Suggs, who was then 63 years old, displayed "shoulder girdle weakness" that she believed was not consistent with his cerebral palsy.  (Dkt.128-14 at 2-3.)  She also noted that Mr. Suggs was no longer able to feed himself with adaptive equipment. (*Id.*)   In her note, which was not addressed to anyone, the physical therapist recommended "[c]onsider obtaining [a] consultation from neurology or specialist in physical medicine."  (*Id.*)

8

According to available records, Mr. Suggs's case manager, Sarah Jenkins, visited United Cerebral Palsy in March 1996 and noted that it "recommend[s] a neurologist evaluation recommended by [its] physical therapist." (Dkt.130-7 at 6.)

Three months later, Symbral's physical therapist, Senora Simpson, evaluated Mr. Suggs and noted "a gradual decline in upper extremity functional abilities," which she explained as "most likely age-related or consumer-determined [*i.e.*, voluntary behavior]." (Dkt.120-3 at 24; *see* Dkt.129-2 at 9.)

A few months later, Mr. Suggs's team met to prepare an updated IHP noting that he "depends on staff for feeding." (Dkt.131-7 at 8.) The IHP did not contain a recommendation for a neurologist evaluation. (Dkt.131-7.)

In February 1997, a District inspector visited United Cerebral Palsy and learned of its recommendation. (Dkt.129-2 at 7-8.) Two days later, the inspector visited the Blair Road home and issued Symbral a deficiency report, which included the failure to provide the recommended evaluation. (Dkt.129-2 at 4, 7-9.) Symbral promptly responded that it had scheduled a neurology appointment for March 7. (Dkt.129-2 at 7.) It further assured that "[t]he nurse will make all medical appointments within one month of recommendation" and the "QMRP will monitor to make sure that the medical recommendation is done . . . timely." (*Id*.)

A Georgetown University Hospital neurologist, Kenneth Plotkin, examined Mr. Suggs as scheduled on March 7 and again on April 1. (Dkt.129-3 at 4-5.) Dr. Plotkin

suspected several possibilities for Mr. Suggs's decreased use of his extremities, including either a "late progression" of his cerebral palsy or a narrowing of the spinal cord in his neck ("cervical stenosis"). (Dkt.129-3 at 4.)   At Dr. Plotkin's recommendation, an MRI was later conducted. (Dkt.129-3 at 4-6.)

Symbral brought Mr. Suggs to see Dr. Plotkin again on June 27. (Dkt.129-3 at 7.) The MRI revealed "severe spinal canal narrowing . . . with cord atrophy." (*Id*.) It separately showed brain "atrophy" and "white matter changes consistent with age-related microvascular disease." (*Id*.) Dr. Plotkin noted that "I will review the MRI with [a radiologist] and request appointment with Dr. Fraser Henderson," a neurosurgeon. (Dkt.129-3 at 8.) Dr. Plotkin further stated: "It may be that this is a non-reversible process at this point, and therefore surgery would not be indicated." (*Id*.)

Dr. Plotkin saw Mr. Suggs again on September 23 and recommended "[p]lease schedule a visit" with Dr. Henderson. (Dkt.129-3 at 9.)

Dr. Henderson examined Mr. Suggs on November 11 and recommended a laminectomy (Dkt.129-5 at 3-4), which is surgery to partially remove vertebrae to decompress the spinal cord.

On December 16, Mr. Suggs visited Dr. Plotkin, who recommended "proceeding with [the] laminectomy as per Dr. Henderson to be scheduled ASAP." (Dkt.129-3 at 10.)

The following month, Ms. Simpson re-evaluated Mr. Suggs and noted a planned team meeting regarding the surgical recommendation. (Dkt.120-3 at 32.) She concluded that "the functional changes that are present are not remarkable to this examiner—age is playing a role." (Dkt.120-3 at 32.)

Mr. Suggs's team met on March 19, 1998, to discuss the surgical recommendation. (Dkt.130-7 at 11.) Those present included Dr. Elliot Gersh, his primary care physician; Mr. Suggs's court-appointed attorney; Ms. Simpson; and Ms. Jenkins. (Dkt.129-6 at 2.) His team agreed that a second opinion was necessary. (Dkt.130-7 at 11.) As the Superior Court found after a review hearing, "[t]he team voted to get a second opinion because it was not clear that given Mr. Suggs['s] age, that the operation would really help [him] and would be worth the discomfort to [him] of the post-operative recuperation." (Dkt.150-6, MR207-08.)

In May, Symbral brought Mr. Suggs to Howard University Hospital's neurology clinic for the second opinion. (Dkt.150-6, MR208.) His IHP two months later noted that his team was still "[a]waiting recommendations at this time until all information is gathered by Howard University Hospital." (Dkt.150-6, MR156.)

In August, Symbral took Mr. Suggs to Howard University Hospital's neurosurgery clinic, which noted Dr. Henderson's surgical recommendation (Dkt.129-7 at 3) and stated that a "neurosurgery consult has been sent to re-evaluate for any surgical intervention" (Dkt.120-3 at 38). The clinic did not complete its evaluation

11

until April 1999, indicating that: "[Mr. Suggs] is a candidate for . . . laminectomy. Will call regarding further arrangements." (Dkt.129-8; *accord* Dkt.120-3 at 42.)

Ms. Weaver, as next of kin, refused consent to the surgery, although the extent of communications with her was disputed. There was evidence that, after Dr. Henderson's surgical recommendation, his team members, including Dr. Gersh, had a conference call with Ms. Weaver, who stated she opposed the surgery. (Dkt.120-3 at 17 ¶ 14; Dkt.148-2 at 51-53.) Mr. Suggs's court-appointed attorney informed Symbral in July 1999 that Ms. Weaver opposed the surgery "you wrote her about." (Dkt.123-1 at 19; *see* Dkt.120-3 at 42-44.) Ms. Weaver acknowledged, though, only that she spoke to someone from the home in February 1999 about the surgery; that when the person called back "I said no"; and that she returned a signed, notarized form in August 1999 refusing consent to the surgery. (Dkt.150-5, Dep. 18-21; *see* Dkt.120-3 at 46; Dkt.148-2 at 46-49.) The risks of surgery included spinal cord damage, paralysis, or death. (Dkt.128-13 at 75-76, 103.)

In December 1999, Mr. Suggs had a surgical repair of a pressure sore with Ms. Weaver's consent. (Dkt.131-10; Dkt.150-5, Dep. 21-22.) In the last two or three years of his life, Mr. Suggs suffered other pressure sores or "decubitus ulcers"—areas of damaged skin caused by staying in one position too long—but these were treated and healed without needing any surgery. (Dkt.120-3 at 18 ¶ 17.)

On December 18, 1999, Mr. Suggs was admitted to Providence Hospital for shortness of breath.  (Dkt.120-3 at 51.)  A neurosurgical consultation concluded that a laminectomy will not "produce any significant improvement in [his] motor function and overall neurological status."  (Dkt.120-3 at 52.)

Meanwhile, a hospital doctor noted a darkening of some toes on Mr. Suggs's right foot "which may indicate some peripheral vascular disease with early gangrene." (Dkt.120-3 at 65.)  Over the next several weeks in the hospital, Mr. Suggs suffered "progressive gangrenous changes," and the hospital amputated above his right knee, with Ms. Weaver's consent.  (Dkt.120-3 at 68-69; Dkt.150-5, Dep. 22.)

After his release from the hospital in February 2000, Mr. Suggs began receiving 24-hour nursing services.  (Dkt.123-1 at 73-74.)  His cousin Mr. Harvey, who had power of attorney, requested that Mr. Suggs be moved near Ms. Weaver in South Carolina.  (Dkt.120-3 at 71; Dkt. 123-1 at 75-76.)  His case manager, now Shireen Hodge, visited and reviewed six skilled nursing homes in the area, and Mr. Suggs was "wait-listed" at several.  (Dkt.123-1 at 22-34, 76.)  Before the move could occur, however, Mr. Suggs was hospitalized for breathing difficulties at and died on June 30, 2000.  (Dkt.150-3 at 10.)

According to the autopsy report, Mr. Suggs's cause of death was "tension pneumothorax following assisted ventilation for treatment of chronic bronchitis and

pulmonary emphysema."   (Dkt.150-3 at 1.)   Contributing conditions were "kyphoscoliosis and diaphragmatic paralysis." (*Id*.)

Shortly before Mr. Suggs's death, Mr. Harvey's counsel sent two notices, dated June 16 and 23, 2000, to the Mayor of a claim against the District.  Those notices identified as injuries the leg amputation and "ongoing pain, dehydration, sepsis and decubitus ulcers."   (Dkt.123-1 at 36-39.)   They described the injury date as "December 23, 1999 through the present." (Dkt.123-1 at 38.) A subsequent notice in November reported his death.  (Dkt.139-3.)

### c.     **Additional evidence.**

(i)     Mary Devasia.

Mary Devasia was a District designee at a Rule 30(b)(6) deposition regarding case management.  No party identified or qualified her as an expert.  Ms. Devasia testified that the group home's nurse or QMRP had the responsibility to schedule medical appointments for its residents.  (Dkt.128-6, Dep. 22-24, 74.)  As Ms. Devasia explained, the QMRP was also required to include in the IHP any medical consultation that the team recommended.  (Dkt.128-6, Dep. 74-75.)  She further testified: "If it is an [IHP]-recommended service and if [the group home] didn't carry through and if a [case manger] didn't follow up on it to insure that it happened, [then] it's a lack of oversight on their part."  (Dkt.128-6, Dep. 74-75.)

14

(ii)    Expert testimony.

The neurosurgeons retained as expert witnesses disagreed on whether Mr. Suggs would have benefited from the laminectomy.  Dr. Fareem Sandhu testified that if the surgery had been done in 1995 then Mr. Suggs "would [have] probably regain[ed] most of his motor strength."  (Dkt.162-3, Dep. 41.)  Meanwhile, Dr. Joel Falik saw no medical evidence to substantiate the cause of Mr. Suggs's decreased motor function.  (Dkt.150-2, Dep. 29-30.)  Dr. Falik opined that surgery would not have helped Mr. Suggs because the 1997 MRI showed that the cervical stenosis was not compressing the spinal cord.  (Dkt.150-2, Dep. 13-14, 37-38.)

(iii)    System-wide issues.

"By the mid-1990s, the District was confronted with financial problems of 'horrendous proportions'" and simply did not "have enough cash to pay all of its bills." *Evans*, 206 F.3d at 1293.  In October 1995, the district court in *Evans* found the District to be in contempt of prior consent orders: (1) by failing to pay provider invoices within 30 days; (2) by exceeding the required case-manager-to-class-member ratio of 1:60; and (3) by reducing spending on habilitation services.  (Dkt.132-7.)  The court entered a remedial plan but imposed no sanctions.  *See Evans*, 206 F.3d at 1293.

Although the remedial plan included monetary penalties for late payments to providers, this Court on appeal reversed the fines ultimately imposed against the District.  *Id.* at 1294-97.  This Court also held that the district court abused its

15

discretion in failing to retroactively modify the consent decree to require that providers be paid within 45 days, rather than 30 days. *Id*. at 1297-99.

According to the Court Monitor's reports, the District began hiring additional case managers in 1995 to achieve the required 1:60 ratio. (Dkt.130-1 at 13-14, 22-23.) There was no evidence that this ratio was not followed in ensuing years. The reports also recommended greater training for case managers and provider staff (*e.g*., Dkt.130-1 at 15-16, 25, 37) and a "comprehensive quality assurance system" (Dkt.130-1 at 18-19).

In February 1999, the Mayor's Office learned of a forthcoming Washington Post article reporting that the system supporting the developmentally disabled had problems, including poor care at some homes. (Dkt.130-10 at 5.) The District took steps to address the problems. (Dkt.130-10 at 5-8.)

The Mayor's Office initiated review, in December 1999, of the entire system for the developmentally disabled. (Dkt.130-10 at 9.) The review determined that the system was "broken" and "incapable of providing quality service." (Dkt.130-11 at 4, 8.) The report recommended better management and training, review and revision of policies, improved coordination among agencies, and increased automation. (Dkt.130-11 at 6.) As the report stated, the District was also attempting to halve the case-manager-to-customer ratio to 1:30. (Dkt.130-11 at 10.) The report concluded that "[p]revious attempts to analyze and fix problems have been too narrow" but that

16

"the system can be fixed through a comprehensive . . . process that includes national best practice design features." (Dkt.130-11 at 8.)

In December 2000, the parties in *Evans* stipulated to facts consistent with the review findings. *Evans v. Williams*, 139 F. Supp. 2d 79, 96 (D.D.C. 2000). Among the stipulations was that "[t]he Mayor and his administration were aware of problems . . . but were not aware that some of the systemic problems could lead to threats to the life and safety of some of the [citizens it served]." *Id.* at 96-97.

In 2001, the district court also approved a compliance plan negotiated by the parties in *Evans*. *Id.* at 80-83. The District agreed to fund a non-profit agency as a permanent, external monitoring body. *Id.* at 83-84.

## 2.    Procedural Background.

### a.    Summary judgment.

The court awarded Mr. Harvey summary judgment on his negligence claim because "no reasonable juror could find that the District['s] monitoring of Symbral's care for Mr. Suggs was anything but negligent." (1/27/12 Op. 12.) The court found that "the plaintiff establishe[d] the standard of care applicable to the District's duty to monitor Symbral's care of Mr. Suggs with expert testimony from Mary Devasia, the District's 30(b)(6) representative." (1/27/12 Op. 8.) It concluded that, in breach of this duty, Ms. Jenkins, his case manager, "did nothing between September 1995 and March 1997 to ensure that the recommendation for a neurology consultation in 1995

17

was ever carried out." (1/27/12 Op. 12.)  The District's failure to monitor, the court found, "resulted in the administration of substandard care by Symbral, leading to a decline in Mr. Suggs's medical condition—and ultimately, his death." (*Id*.)  The court also determined that the District "could have" authorized the laminectomy despite Ms. Weaver's refusal to consent.  (1/27/12 Op. 11.)

The court ruled that D.C. Code § 12-309, which requires written notice of a claim against the District within six months of the injury, limited "the plaintiff's recovery of monetary damages" for negligence to the period after December 23, 1999. (1/27/12 Op. 39.)

The district court also awarded Mr. Harvey summary judgment on his Fifth Amendment claim.  It concluded that "as a result of being involuntarily committed to the District's care and a member of the *Evans* class, Mr. Suggs had a . . . Fifth Amendment right to freedom from harm."  (1/27/12 Op. 31.)  It also found: "The District's involvement in the *Evans* litigation unequivocally establishes . . . that the District had actual or constructive knowledge of the risk of constitutional violations to the *Evans* class members unless adequate medical care was provided.  Yet the District allowed mistreatment of Mr. Suggs and other class members to occur anyway." (1/27/12 Op. 33.)  The court concluded that "[n]o reasonable jury could find . . . that the District did not have a policy of deliberate indifference with respect to protection

from harm and provision of medical care to *Evans* class members, including Mr. Suggs." (*Id.*)

On reconsideration, the court explained its finding of deliberate indifference was not based on Mr. Suggs's team's "decision not to proceed with the laminectomy." (Pretrial Order 7.)  Rather, the court's finding was based on the prior "periods of inaction from 1995 to 1998 in which the District failed to properly supervise the provision of medical care to Mr. Suggs for health issues related to his cervical stenosis, resulting in substantial delays in scheduling recommended appointments for medical consultations, follow-ups, and second opinions." (*Id.*)  Thus, "[e]ven if there was a dispute among medical professionals whether Mr. Suggs should have received a laminectomy," the court found that the evidence "sufficient to support [its] finding of deliberate indifference."  (Pretrial Order 7-8.)

On reconsideration, the court also clarified that its finding of negligence, like deliberate indifference, was not based on "the District's failure to provide Mr. Suggs a laminectomy" but rather its "failure to properly monitor [his] health and medical care from 1995 through 1998." (Pretrial Order 12.)  It also explained that it did not base its summary judgment on the District's "failure . . . to prevent Mr. Suggs's gangrene and amputation" and that any claim based thereon had been waived.  (*Id.*)

After Mr. Harvey moved for summary judgment on his claim under the intellectual disabilities rights statute, and before the District's time to respond elapsed,

19

the court entered judgment for Mr. Harvey on this claim.  (Pretrial Order 13.)  Based on its prior findings, the court found that "the District was negligent under D.C. Code § 7-1305.05(g)," which provides "[e]ach customer [with intellectual disabilities] the right to prompt and adequate medical attention."  (Pretrial Order 13.)

Given the court's ruling on reconsideration that the District was liable only for failing to monitor care for Mr. Suggs's cervical stenosis from 1995 to 1998, the District moved that Section 12-309 barred the entire negligence and statutory claims, thus precluding at trial evidence of damages for those claims.  (Dkt.212.)  The court denied the motion because "the evidence that the District seeks to exclude . . . is in fact admissible under plaintiff's § 1983 claim."  (Supp. Pretrial Order 5.)  It explained that "damages for the District's negligence for the time period limited by § 12-309 . . . are a sub-part of the total damages to be awarded."  (Supp. Pretrial Order 4.)  In a footnote, the court "clarif[ied]" that "the pattern of negligence and deliberate indifference . . . encompasses actions and omissions by the District from 1995 through 1999 and includes [their] effects . . . felt up until Mr. Suggs's death."  (Supp. Pretrial Order 5 n.1.)[2]

---

[2]    The District renewed its Section 12-309 argument at the close of the plaintiff's case and the close of evidence.  (4/16Tr. 115-16; 4/17Tr. 101-02.)

### b.     Pretrial rulings.

(i)     Causation.

Five days before trial, the court precluded the following evidence that the District had intended to introduce: "decisions of the [team] regarding Mr. Suggs"; "concerns of the [team regarding] Mr. Suggs's condition"; "the theory that . . . surgery would have caused Mr. Suggs more harm"; "efforts to contact [Ms. Weaver]" to obtain consent for the surgery; and "alternate causes of Mr. Suggs's deterioration." (Supp. Pretrial Order 8-9 (capitalization omitted); *see* Pretrial Statement 17-20; Dkt.188 at 1-2.) The court ruled such evidence was "irrelevant to the issue remaining in this case regarding . . . damages." (Supp. Pretrial Order 8.)

In the same pretrial order, the court precluded the District's expert, Dr. David Jackson, from testifying at trial. (Supp. Pretrial Order 7-8.) Dr. Jackson would have opined that Ms. Weaver's refusal to consent to surgery was reasonable given that surgery would not have improved Mr. Suggs's condition and had other downsides. (Dkt.167-3; Dkt.186 at 17.) The court ruled, however, that because "the only claims remaining in this case pertain to damages and not liability," Dr. Jackson's testimony was "irrelevant." (Supp. Pretrial Order 7-8.)

When trial began, the District reiterated its request to "show that some of Mr. Suggs's pain might be attributable to other sources" besides cervical stenosis. (4/10Tr. 115.) Those sources included the natural worsening of his cerebral palsy and scoliosis

21

as he aged.  (4/10Tr. 116-17.)  The District asked to cross-examine Mr. Harvey's witnesses on this point.  The court denied the request because "I think those really are alternative theories of liability."  (4/10Tr. 124; *accord* 4/13Tr. 1-8.)

The District also argued that Ms. Weaver's refusal to consent to the surgery was relevant to show a "break in the chain of causation for damages."  (4/10Tr. 121-23.) The court declined again to allow evidence of Ms. Weaver's non-consent, explaining that "the undisputed evidence that [the District] did consent to other operations in non-emergency circumstances indicates to me that whatever happened here, the District could have consented and was simply indifferent to consenting."  (4/10Tr. 124.)

(ii)    Dr. Gersh.

The pretrial order also limited Dr. Gersh, Mr. Suggs's physician, to testifying about "facts observed," not any "expert opinion."  (Supp. Pretrial Order 9.)  Dr. Gersh would have testified regarding his participation in the March 1998 team meeting on the surgical recommendation.  (Pretrial Statement 18.)  His view had been that, given Mr. Suggs's age and condition, the surgery and the post-operative recovery risked further loss of strength and functioning.  (Dkt.225, Dep. 26-27, 36-39.)  Dr. Gersh also believed that that Mr. Suggs's functional decline was consistent with the effects of cerebral palsy as he aged.  (Dkt.225, Dep. 22-23, 48-49.)

The court's basis for exclusion was the District's "failure to comply with Federal Rule Civil Procedure 26(a)(2)(C)," which requires disclosure of expert

testimony of treating doctors.  (Dkt.220 at 9.)  When trial began, the District noted that

Rule 26(a)(2)(C) had not been in effect when it had made expert disclosures years

earlier, and that Dr. Gersh's opinions had already been disclosed through his

deposition.  (4/10Tr. 97-100.)  The court ruled, though, that it would "not [have been]

impractical" to disclose Dr. Gersh's opinions when the District supplemented its

expert disclosures after the rule became effective in December 2010.  (4/10Tr. 106.)

   (iii) Pressure sores.

  The court ruled pretrial that evidence of Mr. Suggs's pressure sores was

irrelevant since its summary judgment ruling did not establish they were "a direct

consequence of [his] loss of motor function."  (Dkt.220 at 6.)  Mr. Harvey had sought

to hold only Symbral liable for the pressure sores based on its failure to "turn and re-

position [Mr. Suggs] to alleviate the pressure" (Dkt.128 at 35-38), and the court had

already found Symbral negligent on this basis (1/27/12 Op. 14-15).

  At the start of trial, Mr. Harvey sought reconsideration, arguing that Mr. Suggs's

decreased motor function due to the cervical stenosis contributed to the pressure sores'

development.  (4/10Tr. 90-92.)  Granting reconsideration, the court allowed evidence

of the pressure sores, reasoning that Mr. Suggs's "loss of ability in motor function is

attributable to the District[] and properly established in the record."  (4/10Tr. 124.)

  Given the court's ruling, the District sought to question Mr. Harvey's experts

whether the sores were Symbral's fault, as the court had held on summary judgment.

(4/10Tr. 128.)  The court refused, stating: "I don't see how it matters whose fault it is in terms of damages." (*Id*.)  When the District requested to show Symbral's fault was an "intervening cause," the court said, "No." (*Id*.)

### c.    Trial.

The court preliminarily instructed the jury that "the District violated Mr. Suggs's rights by failing to monitor his medical care and provide [the] laminectomy" and that the jury would "decide what amount of damages, if any, will fairly compensate [his] estate for the District's failure." (4/11Tr. 8.)  It also instructed that, "as a result of the District's policy of deliberate indifference . . . , Mr. Suggs suffered multiple injuries and ultimately died." (4/11Tr. 9.)

Mr. Harvey's expert witnesses opined that Mr. Suggs's health problems resulted from the failure to conduct the laminectomy. (*E.g.*, 4/16Tr. 16-17, 19-21, 35.)  With most of its evidence excluded, the District was limited to contesting only the quantum of pain that Mr. Suggs had suffered.  The District's witnesses testified that he had generally appeared pain-free. (*E.g*., 4/13Tr. 115.)

### (i)    Proximate cause instruction.

The court gave a final instruction requiring the jury to determine proximate cause.  It instructed: "You must decide which of the plaintiff's injuries, if any, were proximately caused by the [District]'s conduct.  If any of the plaintiff's injuries were caused by the [District]'s conduct, then you must decide the amount of damages to

24

award for them." (4/18Tr. 65.) While Mr. Harvey objected that proximate cause had already been established, the court concluded "the jury still has to find proximate cause for the injuries that [Mr. Suggs] actually suffered." (4/17Tr. 84.)

(ii)    Probate lien.

The court accepted Mr. Harvey's proposed instruction regarding a probate lien, about which the jury had heard no evidence. It instructed that "any award of damages may be subject to a claim by the [District] that it is entitled to be repaid $595,000 for the cost of care it provided to [Mr.] Suggs." (4/18Tr. 64); *see* D.C. Code § 7-1303.11(a). The District objected that the instruction was "not relevant" and would cause jury speculation about the lien's merits. (4/17Tr. 90.) The court decided, however, to give the instruction since it would also instruct whether the jury's award would be taxable. (4/17Tr. 90.) It rejected the District's proposal that neither instruction be given. (4/17Tr. 90-91.) As it turned out, the court did not instruct about taxation, only the lien. (4/18Tr. 62-67.)

At the end of closing, Mr. Harvey's counsel emphasized the lien instruction:

> Your job now is to speak for Curtis. That responsibility has been given to you as the jury in this case, and in doing so hold the District accountable. Give a just verdict. Justice is demanded here to hold [the District] accountable for [what it] did to [him].

> One of the things that is really amazing, you're going to see in the jury instructions the District is so unwilling to accept their responsibility in this case, they actually want to get back from whatever award you all come up with, they want to get paid—

25

(4/18Tr. 48.)  The District objected, but the court overruled the objection.  (4/18Tr.

48.)  Counsel continued:

> They want to get paid back $595,000 for the money they paid to the group home to house him, okay?  That's what they want.  You will see the jury instruction.  They want to get paid back.  Not only will they not accept their responsibility, they want to get paid back money.
>
> Think about all of that, please, as you come up with a verdict . . . .

(4/18Tr. 48-49.)

The jury's only question during its brief deliberations concerned the lien.  It

asked: "Will the D.C. Government's claim of $595,000 be against the gross award or

the net award?"  (Dkt.239.)  Denying the District's motion for a mistrial, the court

referred the jury to its original instruction that "any award of damages" was subject to

the lien.  (4/18Tr. 75-77.)

### d.    The District's cross-claim for contribution.

Before trial the court determined that, given its entry of summary judgment

against Symbral for negligence, "the District as a non-settling defendant is entitled to

a *pro rata* (50%) contribution from [Symbral] for the amount of damages awarded"

for the District's negligence.  (Pretrial Order 16.)

Post-trial, the District moved for a 50% reduction of the $2.9 million verdict.

(Dkt.244.)  The district court recognized: "The concurrent actions and omissions of

both [the District and Symbral] combined to create one indivisible injury."  (8/16/12

Order 3-4.)  Nevertheless, the court denied a 50% contribution for the entire award

26

because Symbral, unlike the District, was not held liable under 42 U.S.C. § 1983. (8/16/12 Order 7.) Instead, the court awarded contribution only for the portion of the award attributable to the District's negligence, which the court equated with the jury's allocation of $500,000 in damages to the period after December 23, 1999. (8/16/12 Order 6-7.) Accordingly, the District received just a $250,000 contribution. (*Id.*)

### e. New trial motion.

In denying the District's motion for a new trial, the court found no error in excluding the District's causation evidence since it had already held "that the District's conduct had caused Mr. Suggs's injuries" and so the District "was not allowed to relitigate liability at trial." (4/24/13 Order 7.) The court re-affirmed its exclusion of Dr. Gersh's opinion testimony because "the District's failure to comply with Rule 26(a) cannot be said to be 'substantially justified' or 'harmless.'" (4/24/13 Order 10.) It also held that its instruction on the probate lien was "reasonable," citing the standard instruction on the taxation of damage awards (which it had not given). (4/24/13 Order 15.) The court found too "no indication of how the jury used the information [about the lien] or whether they relied upon it in [deciding] damages." (4/24/13 Order 16.)

### STANDARD OF REVIEW

This Court "review[s] a grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party and drawing all

reasonable inferences in the nonmoving party's favor." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 4 (D.C. Cir. 2011).

While evidentiary rulings are reviewed for abuse of discretion, a court "by definition abuses its discretion when it makes an error of law." *In re Subpoena Duces Tecum*, 439 F.3d 740, 743 (D.C. Cir. 2006).

Whether the district court properly instructed the jury is 'a question of law . . . review[ed] de novo.'" *United States v. Ring*, 706 F.3d 460, 465 (D.C. Cir. 2013).

"[Q]uestions of contribution" are reviewed de novo. *Hubbard v. Chidel*, 790 A.2d 558, 570 (D.C. 2002).

## SUMMARY OF ARGUMENT

This Court should reverse the judgment and fee award against the District.

1. The District, not Mr. Harvey, was entitled to summary judgment on the substantive due process claim. This claim fails first because the District did not impose any liberty restriction on Mr. Suggs creating an affirmative, constitutional duty to protect. The District merely paid for services his family requested, provided to Mr. Suggs in a private home and by private entities; those services would have ceased upon request of his family or, if Mr. Suggs had ever become competent, his own request. Second, even assuming such a duty, the evidence was insufficient to show a constitutional violation by a District official exhibiting deliberate indifference to his

28

medical needs.  Far from failing to act, District officials monitored the care Symbral

provided Mr. Suggs.  This care included numerous doctor visits, multiple opinions

from neurosurgeons, review by his team of professionals, and consultation with his

sister.  And third, even assuming a constitutional violation, the evidence was

insufficient to show municipal liability.  Rather than choosing to permit such

violations, District policymakers had enacted laws and policies, and created an entire

infrastructure, designed to provide high quality services for citizens with intellectual

disabilities and also took steps to identify and correct any deficiencies in those

services.  At the very least, the District is entitled to have a jury weigh the evidence.

The District was also entitled to summary judgment on Mr. Harvey's local law

claims.  These claims are barred because the notice provided under D.C. Code § 12-

309 did not identify the injury claimed at trial—the failure to promptly diagnose and

surgically correct Mr. Suggs's cervical stenosis—and would have been too late even if

it had.  The district court erred in permitting recovery for an injury's effects if felt

within the notice period, even absent timely and proper notice of the injury itself.  Mr.

Harvey's claim under the District's intellectual disabilities rights statute separately

fails because a showing of negligence is insufficient.  Alternatively, a jury must decide

this statutory claim and the common-law negligence claim.  In entering summary

judgment for Mr. Harvey, the court erroneously relied on just one witness, whose

29

testimony established neither the standard of care nor a breach of that standard and must be weighed with all of the other evidence.

2. Even if properly held liable, the District is entitled to a new trial on damages. While properly submitting the issue of proximate cause to the jury, the court erroneously excluded the District's evidence on this issue. The court barred evidence regarding the decision against surgery—a superseding cause of the claimed damages—mistakenly believing it had found (or could have found) the District liable for this decision. Without basis, the court also erroneously denied cross-examination of Mr. Harvey's experts to show Mr. Suggs's pre-existing conditions were alternate, independent causes of his health decline. Its refusal to allow opinion testimony from Mr. Suggs's treating physician to support this causation theory, based on an intervening rule change on expert disclosures, was an abuse of discretion, particularly since there was no unfair prejudice. The court further erred in precluding the jury from considering Symbral's established negligence in causing Mr. Suggs's pressure sores as a superseding cause of this element of damages.

The District is entitled to a new trial also due to the court's erroneous jury instruction that its award was subject to a probate lien filed by the District for the cost of care provided Mr. Suggs. With no evidence about the lien, the jury undoubtedly used the instruction to inflate its award and penalize the District, exactly as Mr.

Harvey had urged the jury to do in closing argument, over the District's objection, and as further shown by a jury note.

3.  Even assuming the Court upholds the verdict, the District is entitled to a 50% contribution from Symbral, since the district court found the District and Symbral were joint tortfeasors, regardless of the differing theories of liability.

## ARGUMENT

**I.      The District, Not Mr. Harvey, Was Entitled To Summary Judgment.**

**A.      The District was entitled to summary judgment on the Fifth Amendment claim.**

The District was entitled to summary judgment on the Fifth Amendment substantive due process claim.  To establish the District's liability, Mr. Harvey had to prove a "predicate constitutional violation" and that "a custom or policy of the municipality caused the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  He failed on both elements.

1.      The Fifth Amendment claim fails for lack of a "special relationship."

"To constitute a substantive due process violation, the defendant official's behavior must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006).  Where, as here, the alleged conscience-shocking conduct is not affirmative government action, but a failure to act, the plaintiff "must show that the

31

official was at least deliberately indifferent to his constitutional rights." *Id.* "Because deliberate indifference requires a 'lower threshold' showing than does an affirmative act," an official's deliberate indifference is conscience-shocking only if the "'special circumstances' of a special relationship exist." *Id*.

The District did not deprive Mr. Suggs of liberty in a manner giving rise to a "special relationship." In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court found that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs," a "special relationship" exists which gives rise to an affirmative duty to protect that person. *Id*. at 200-02; *accord Estate of Phillips*, 455 F.3d at 406. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, *institutionalization*, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means." *DeShaney*, 489 U.S. at 200 (emphasis added).

Here, the District did not restrict Mr. Suggs's freedom to act through institutionalization. Mr. Suggs had been "deinstitutionalized" by 1984. *Evans*, 459 F. Supp. at 485-87; *cf. Youngberg v. Romeo*, 457 U.S. 307, 309 (1982) (recognizing

32

certain substantive due process rights when confined to a "state institution"). Thereafter, Mr. Suggs was living in the community in a private home. (Dkt.150-6, MR353-54.) Indeed, District law required, and courts annually determined, that he was living under the "least restrictive conditions necessary to achieve the purposes of habilitation." D.C. Code § 7-1305.03. Any limitation on Mr. Suggs's inability "to take care of himself . . . was not due to anything the [District] did." *Harris v. District of Columbia*, 932 F.2d 10, 14-15 (D.C. Cir. 1991). It was due to his developmental disabilities, for which the District obtained habilitation services provided to him in a private home and at a private day program. Nor did the District restrict his ability to receive care from any source. Under District law, "each resident has the right to receive visits from his or her attorney, physician, psychologist, clergyman, social worker, parents or guardians . . . in private, at any reasonable time, irrespective of visiting hours." D.C. Code § 7-1305.05.

The description of Mr. Suggs as "involuntarily committed" does not change the analysis. While relevant, *see Smith v. District of Columbia*, 413 F.3d 86, 94 (D.C. Cir. 2005), this formal description obscures the actual facts, as just described. Moreover, it was Mr. Suggs's sister, Ms. Weaver, who applied to admit him to Forest Haven. (Dkt.123-1 at 7.) Indisputably, Mr. Suggs was never competent to make that decision himself. But if he had ever become competent to request his discharge, or if Ms. Weaver had ever requested it, then his discharge from "commitment" was mandatory

33

upon such request.  *See* D.C. Code §§ 7-1303.07-.08.  In fact, at his family's request, Mr. Suggs was in the process of being discharged and moved to a nursing home in South Carolina when he died.  (Dkt.123-1 at 22-34, 76.)  And, absent a formal request for discharge, Ms. Weaver was free, as a practical matter, to take Mr. Suggs back into her care for extended time periods whenever she wished, and she did so fairly regularly.  (Dkt.150-5, Dep. 13; 4/11Tr. 95.)  Even assuming his commitment significantly restricted his liberty, those restrictions were not "imposed" by the District but rather "agree[d] to" by Mr. Suggs's family on his behalf.  *Estate of Phillips*, 455 F.3d at 405 n.11 (citing *Walton v. Alexander*, 44 F.3d 1297, 1303-05 (5th Cir. 1995) (en banc)).

> 2.  Even assuming a special relationship, the evidence is insufficient to show deliberate indifference rising to a constitutional violation.

Even if there were a special relationship, Mr. Harvey failed to show that District officials were "deliberately indifferent" to Mr. Suggs's medical needs in violation of substantive due process.  *Id*. at 403.  An official is deliberately indifferent when he or she "knows of and disregards an excessive risk to [the plaintiff's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (prison conditions).  The test is a subjective one—"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Id*.

34

In granting summary judgment, the district court did not specifically explain how any District official was deliberately indifferent to Mr. Suggs's medical needs. The court made clear that that its finding of deliberate indifference was *not* based on "the District's failure to provide [the] laminectomy." (Pretrial Order 12.) Instead, the court found deliberate indifference based on prior "periods of inaction from 1995 to 1998 in which the District failed to properly supervise the provision of medical care to Mr. Suggs for health issues related to his cervical stenosis, resulting in substantial delays in scheduling recommended appointments." (Pretrial Order 7.) Although the court faulted Ms. Jenkins, Mr. Suggs's case manager, in this regard, the court never found that she (or any other District official) knew of, and disregarded, an excessive risk to his health.

In any event, the evidence was insufficient to show that Ms. Jenkins was deliberately indifferent. In September 1995, when Mr. Suggs was 63 years old, a physical therapist at his day program noted "consider obtaining consultation from neurology" regarding his "shoulder girdle weakness." (Dkt.128-14 at 2-3.) There is no evidence to whom this recommendation was made or that Ms. Jenkins had learned of it before March 1996, when she visited Mr. Suggs's day program and noted it in the case file. (Dkt.130-7 at 6.) Ms. Jenkins did not document her response to the recommendation, but case managers would report "mainly orally" to the group homes when needed. (Dkt.128-8, Dep. 24.) It was the role of the group home to schedule

35

medical appointments.  (*See supra* at 7.)  Three months later, Symbral's physical

therapist, Ms. Simpson, evaluated Mr. Suggs and concluded that his "gradual decline

in upper extremity functional abilities" was "most likely age-related or consumer-

determined."  (Dkt.120-3 at 24.)  Especially given the later physical therapist's

opinion, these circumstances provide no basis to find Ms. Jenkins, who was not a

medical professional, deliberately indifferent to Mr. Suggs's medical needs.

Ms. Jenkins was not deliberately indifferent based on Mr. Suggs's subsequent

IHP either.  There is no evidence that his team recommended a neurology consultation

when it met in August 1996 (Dkt.130-7 at 7), and, indeed, the IHP does not contain

any such recommendation (Dkt.131-7).  The role of the case manager was not to

develop the IHP but to verify, through quarterly visits, that Mr. Suggs was receiving

his IHP-recommended services.  (*See supra* at 7.)  Since the neurology consultation

was not among the IHP's recommendations, the IHP is not a basis for finding Ms.

Jenkins deliberately indifferent.  *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir.

2013) (holding non-medical professionals not deliberately indifferent because they

were "entitled to rely on the medical professionals' determination").  Even assuming

that the team's failure to recommend the evaluation was an oversight and further

speculating that Ms. Jenkins could have corrected it, deliberate indifference requires

more than negligence.  *See Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C.

Cir. 2008) (citing as deliberate indifference an official "who intentionally denies or

36

delays access to medical care or intentionally interferes with the treatment once prescribed" (internal quotation marks and brackets omitted)).

Mr. Harvey also cannot show that Ms. Jenkins was deliberately indifferent once Symbral made an appointment for a neurological evaluation. In February 1997, a District inspector, upon visiting Mr. Suggs's day program, learned it had recommended a neurological consultation. (Dkt.129-2 at 7-8.) After the inspector issued Symbral a deficiency report, Symbral promptly scheduled a neurology appointment. (*Id*.) Over the next nine months, Mr. Suggs had six visits with a neurologist or a neurosurgeon at Georgetown University Hospital, and also underwent an MRI. (*See supra* at 9-10.) The neurosurgeon ultimately recommended the laminectomy in November 1997. (Dkt.129-5 at 3-4.) While Mr. Harvey criticizes the time it took to obtain this recommendation, Symbral and the doctors were responsible for the timing and coordination of whatever visits and procedures were necessary to obtain the medical opinion. Their efforts would not have been obviously lacking to Ms. Jenkins during her quarterly visits.

Contrary to any suggestion of deliberate indifference, a team meeting occurred in March 1998 to discuss the surgical recommendation. (Dkt.130-7 at 11.) Those present included Dr. Gersh (Mr. Suggs's physician), Ms. Simpson, and Mr. Suggs's court-appointed attorney, as well as Ms. Jenkins. (Dkt.129-6 at 2.) The team decided to get a second opinion "because it was not clear . . . given Mr. Suggs['s] age, that the

operation would really help [him] and would be worth the discomfort to [him] of the post-operative recuperation." (Dkt.150-6, MR207-08.) Ms. Simpson continued to believe that Mr. Suggs's functional changes were unremarkable given his age. (Dkt.120-3 at 32.) To obtain the second opinion, Symbral took Mr. Suggs to Howard University Hospital on at least two occasions. (Dkt.120-3 at 37-38.) While the hospital required many months before it ultimately recommended the surgery, once again there is no evidence that the timing was even within the control or responsibility of the District's case manager.

Consistent with the summary judgment ruling, District officials were not deliberately indifferent for failing to provide Mr. Suggs the laminectomy. (Pretrial Order 7.) His team's decision against a laminectomy was reasonable given its concerns about the surgery and Ms. Weaver's refusal to consent. Notably, Mr. Harvey does not claim that a District official could have legally authorized it without Ms. Weaver's consent or without asking the court to appoint a guardian to consent. (Dkt.162 at 11); *see* D.C. Code § 21-2210. Although a District official may have consented to prior medical procedures, including the 1997 MRI, these procedures were not invasive surgery. (*See* Dkt.131-11.) And regardless, it would still be undisputed that a District official could not have legally consented to the laminectomy. Moreover, Mr. Harvey does not identify any District official who was deliberately indifferent for failing to seek appointment of a guardian who might override Ms.

38

Weaver's refusal to consent.  Nor would there be any basis for such a claim, not only given the team's concerns about the surgery and Ms. Weaver's opposition, but also since a third neurosurgeon, who evaluated Mr. Suggs in late 1999, concluded that a laminectomy would not have benefited Mr. Suggs.  (Dkt.120-3 at 52.)

      3.    Even assuming an underlying constitutional violation, the evidence was insufficient to show a District policy.

Assuming that Mr. Harvey had shown a special relationship and deliberate indifference by a District official, he failed to show that a policy or custom of the District of Columbia caused the violation of substantive due process.  "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978).  Instead, a plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997).  A plaintiff must also show "an 'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker*, 326 F.3d at 1306-07 (citation omitted).

The district court erroneously found a District "policy of deliberate indifference" with respect to "the provision of medical care" to the intellectually disabled. (1/27/12 Op. 33.) The "deliberate indifference" standard for establishing a municipal policy is distinct from that required to show an underlying constitutional violation. *Baker*, 326 F.3d at 1306-07.  It is an objective standard, "determined by

39

analyzing whether the municipality knew or should have known of the risk of constitutional violations, but did not act." *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011). "Holding a municipality liable for its deliberate indifference requires more than 'a showing of simple or even heightened negligence.'" *Johnson v. District of Columbia*, No. 11-5115, slip op. at 9 (D.C. Cir. Nov. 15, 2013). Only if a municipal policy was "so likely to result in the violation of constitutional rights," and the need to change the policy "so obvious," could "policymakers of the city . . . have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

The evidence was insufficient to show that District policymakers deliberately chose to permit constitutional violations of the right of intellectually disabled persons to medical care. To the contrary, District lawmakers enacted the intellectual disabilities rights statute in 1979 to assure that citizens with intellectual disabilities would enjoy their full "civil and legal rights." D.C. Code § 7-1301.02(a)(1). For facility residents, the Act provided a judicially enforceable right to "prompt and adequate medical attention," including a complete annual physical evaluation. D.C. Code §§ 7-1305.05(g), 7-1305.13-.14. The Act also provided for a comprehensive evaluation by other appropriate specialists and an IHP to be updated annually, D.C. Code § 7-1305.04(a), annual review hearings in the Superior Court, D.C. Code § 7-1304.11, and representation by a court-appointed attorney, D.C. Code § 7-1304.02. It

thus created a structure to address the needs, including the medical needs, of persons with intellectual disabilities.

District policymakers also established appropriate standards for the annual licensing of facilities, including Mr. Suggs's home. *See* D.C. Code § 44-501 *et seq.*; 22B D.C.M.R. ch. 35. These standards required that the home retain all appropriate professional services, including medical services, 22B D.C.M.R. § 3520, and ensure the updating and implementation of each resident's IHP, *see* 22B D.C.M.R. §§ 3517.10-.12, 3521.6. As required by law, District inspectors conducted an unannounced inspection for compliance with these standards as a condition of annual license renewal and follow-up inspections if any deficiencies were found. (*See supra* at 7-8.) In the present case, a District inspector learned of the day program's recommendation for a neurological consultation and directed Symbral to make the appointment, which it did. (Dkt.129-2 at 7-8.) The District also employed case managers, who by policy visited each resident quarterly to verify receipt of IHP-recommended services. (*See supra* at 7.)

The court erroneously believed that the *Evans* litigation showed a policy of deliberate indifference. To the contrary, the District *agreed to* a series of orders in *Evans* more than 30 years ago that still "govern[] almost every aspect of the District's treatment of the [intellectually disabled]." *Evans*, 206 F.3d at 1293. Indisputably, the District consented to far greater obligations than constitutionally required. *See Horne*

41

*v. Flores*, 557 U.S. 433, 448 (2009) (noting that many consent decrees "go well beyond what is required by federal law"); *cf. Youngberg*, 457 U.S. at 319 ("minimally adequate or reasonable [habilitative] training to ensure safety and freedom from undue restraint" is constitutionally required in a state institution). The District also hired a Court Monitor to assist in the orders' implementation. *Evans*, 459 F. Supp. at 485-86. Although the Monitor reported in 1995, as the District was suffering a massive financial crisis, that implementation had faltered—*e.g.*, regarding the 30-day deadline for provider payments and the 1:60 case-manager-to-client ratio—the District began efforts that soon corrected those issues. (*See supra* at 15-16.) When a February 1999 newspaper article reported poor care at some group homes, the District took steps to address the problems. (Dkt.130-10 at 5-8.) The Mayor's Office also initiated a system-wide review of the entire system for the developmentally disabled. (Dkt.130-10 at 9.) This review led the District in *Evans* to stipulate to facts consistent with the review findings, negotiate a compliance plan, and fund a permanent, external monitoring body. (*See supra* at 16-17.)

The court erroneously read the December 2000 stipulated facts in *Evans* as "admitt[ing]" a "policy" of "deliberate indifference" to "constitutional rights" to "adequate medical care." (1/27/12 Op. 32.) There was no such admission, or indeed any stipulation that the medical care provided to any individual receiving services was inadequate. While correctly recognizing these stipulations as non-binding here

42

(1/27/12 Op. 33 n.4), the court ignored the stipulation that the Mayor's administration took steps to correct known problems and had not been aware of any problems that "could lead to threats to life and safety." (Dkt.131-1 ¶¶ 5-6.) Although the administration's review (and resulting stipulations) had concluded that its service delivery fell quite short of its goals, those goals were not minimal constitutional standards but rather "national best practice[s]." (Dkt.130-11 at 8; *accord* Dkt.131-1 ¶¶ 24, 85.) Moreover, the District never stipulated it "did not act" in response to problems, *Jones*, 634 F.3d at 601, only that its prior attempted fixes were just "too narrow." (Dkt.131-1 ¶ 27.) And these stipulations cannot negate the overall fact that District policymakers had instituted laws, policies, and systems intended to provide comprehensive, high quality services to persons with developmental disabilities. *See Franklin v. District of Columbia*, 163 F.3d 625, 636-37 (D.C. Cir. 1998) ("That the District even had [a pertinent] policy militates against a finding of deliberate indifference.").

This Court has left "no doubt 'deliberate indifference' requires a high degree of fault." *Dorman v. District of Columbia*, 888 F.2d 159, 163 (D.C. Cir. 1989). The evidence here is insufficient to meet that standard.

> 4.    Alternatively, a jury must decide the claim.

Even assuming that the District were not entitled to summary judgment, it would at least be entitled to a jury trial. Viewing the evidence and drawing all

43

reasonable inferences in the District's favor, a jury could conclude that Mr. Harvey has not met his burden of proving that Ms. Jenkins (or any other District official) knew of, and disregarded, an excessive risk to Mr. Suggs's health.  (*See supra* at 34-39.) Similarly, a jury could also conclude that Mr. Harvey has not met his burden of proving a District policy that was the moving force behind the underlying constitutional violation.  (*See supra* at 39-43.)

### B.    The District was entitled to summary judgment on the negligence and statutory claims.

#### 1.    D.C. Code § 12-309 bars the claims.

The District is entitled to judgment on the negligence and statutory claims for lack of notice under D.C. Code § 12-309.  This provision bars an action unless the claimant has given the Mayor written notice, "within six months after the injury or damage was sustained" of "the approximate time, place, cause and circumstances of the injury or damage."  D.C. Code § 12-309.  "[T]he doctrine of equitable tolling does not apply to [§] 12-309."  *Barnhardt v. District of Columbia*, 8 A.3d 1206, 1209 (D.C. 2010).  "Unlike a statute of limitations, which can be tolled through the discovery rule, § 12-309 starts the clock at the instant an injury or damage is sustained."  *Brown v. District of Columbia*, 853 A.2d 733, 736-37 (D.C. 2004).

At trial, Mr. Harvey attributed all of the claimed damages to the failure to promptly diagnose and surgically correct Mr. Suggs's cervical stenosis.  (*E.g.*, 4/16 Tr. 16-17, 19-21, 35.)  This alleged failure, however, was not an injury identified in the

§ 12-309 notices. (Dkt.123-1 at 36-39; Dkt.139-3.) The omission of this injury from the notices is not surprising since Ms. Weaver had opposed the surgery.

Even if this injury had been identified, notice would have been untimely. The injury occurred by 1997 or 1998 when, after a worsening of Mr. Suggs's condition, the diagnosis of cervical stenosis was made and surgery recommended. (*See supra* at 9-10); *Brown*, 853 A.2d at 739 (holding that "the injury in these cases is the worsening or deterioration of the plaintiff's condition that results from the . . . failure to diagnose the patient's medical condition"). It certainly occurred by August 1999, by which time the second opinion had been obtained and Ms. Weaver had refused consent to the surgery. (*See supra* at 11-12.) Because the notices were not filed until June 2000 and stated that any claimed injury occurred after "December 23, 1999," (Dkt.123-1 at 38), D.C. Code § 12-309 bars the negligence and statutory claims.

The district court erred in treating this non-compliance with § 12-309 as merely limiting how far back in time damages were recoverable. In the court's view, the lack of timely and proper notice of the injury did not preclude recovery for any effects of the injury that were felt subsequent to December 23, 1999. (Supp. Pretrial Order 5 & n.1.) This is plainly incorrect. *See District of Columbia v. Dunmore*, 662 A.2d 1356, 1362 (D.C. 1995) (reversing entire $850,000 verdict and dismissing medical malpractice claim where notice was given eight months after leg amputation and thus two months too late). Otherwise a claim for an injury with permanent or long-term

effects could be brought at practically any distance of time, notwithstanding § 12-309. This would be utterly inconsistent with the statute's purpose to permit the District "to conduct an early investigation of the facts and circumstances surrounding a claim." *Owens v. District of Columbia*, 993 A.2d 1085, 1088 (D.C. 2010). And it would contravene the principle that Section 12-309 "is to be construed narrowly against claimants." *Id.* The six-month clock starts running "at the instant" of the injury, *Brown*, 853 A.2d at 736-37, not each time an effect of the injury is felt.[3]

> 2. Even if D.C. Code § 12-309 is not a bar, the statutory claim fails for the same reasons as the Fifth Amendment claim.

Aside from the error in applying § 12-309, the district court erroneously granted summary judgment against the District under its intellectual disabilities rights statute. (*See* Pretrial Order 13.) D.C. Code § 7-1305.14(c) provides:

> Any person who violates or abuses any rights or privileges protected by this chapter shall be liable for damages as determined by law, for Court costs and for reasonable attorneys' fees. Any person who acts in good faith compliance with the provisions of this chapter shall be immune from civil or criminal liability . . . . However, this section shall not relieve any person from liability for acts of negligence, misfeasance, nonfeasance, or malfeasance.

Although adequate medical attention is one such protected right, D.C. Code § 7-1305.05(g), the quoted language imposes a mens rea requirement for liability. *Cf.*

---

[3]      Even if an injury's "effects" within the notice period were recoverable, the notices still omit the requisite "cause and circumstances" by omitting mention of the cervical stenosis or laminectomy. *See Doe by Fein v. District of Columbia*, 697 A.2d 23, 27-29 (D.C. 1997).

*United States v. Project on Gov't Oversight*, 616 F.3d 544, 550 (D.C. Cir. 2010). The phrase "violates or abuses" strongly suggests a level of culpability requiring knowledge or intent, rather than mere negligence. Indeed, the statute exempts from liability anyone acting in "good faith," thus indicating that liability requires ill will or a self-interested motive. The language that "this section shall not relieve a person from liability for acts of negligence" merely means that the section is not establishing good-faith as a defense to an otherwise available common-law claim.

The court erred in finding the District liable under D.C. Code § 7-1305.14(c) based on negligence. Because the level of culpability is at least that required under Section 1983, the evidence is insufficient for the same reasons as under the federal statute. (*See supra* at 34-43.)

3.      Alternatively, a jury must decide the claims.

Even assuming that summary judgment for the District on the negligence and statutory claims were not warranted, a jury trial would be required. Because both claims are premised on negligence, Mr. Harvey must at least prove "duty, breach of that duty, and injury proximately caused by the breach." *Speights v. 800 Water St., Inc.*, 4 A.3d 471, 475 (D.C. 2010). Moreover, a plaintiff must adduce "expert testimony to establish what the standard of care is if the subject . . . is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Briggs v. WMATA*, 481 F.3d 839, 845 (D.C. Cir. 2007). In

47

seeking summary judgment, Mr. Harvey's entire argument was that "[t]he District's 30(b)(6) representative, Mary Devasia, testified that the case manager's failure to ensure completion of the neurological evaluation constituted a lack of proper monitoring." (Dkt.128, Mem. 30.)

Ms. Devasia's testimony does not establish negligence. Her testimony was merely that if the group home did not fulfill its responsibility to provide an "[IHP]-recommended service" and the case manager "didn't follow up . . . to insure that it happened, [then] it's a lack of oversight on their part." (Dkt.128-6, Dep. 74-75.) Mr. Suggs's relevant IHPs did not, however, recommend a neurological evaluation. (*E.g.*, Dkt.131-7.) Thus, Ms. Devasia's testimony failed to show that his case manager, Ms. Jenkins, breached any duty. Her testimony does not even show that Ms. Jenkins failed to follow up after learning in March 1996 that the day program physical therapist recommended the evaluation. Ms. Jenkins made a written note in her case file, presumably for the very purpose of following up. (Dkt.130-7 at 6.) While there is no written documentation of her follow-up with the group home, such communications were "mainly oral[]." (Dkt.128-8, Dep. 24.) And although Mr. Suggs's subsequent IHP did not recommend a neurological evaluation, it would be speculation to attribute this to lack of follow-up, rather than to his team's agreement with the conclusion of a more recent physical therapy evaluation that the motor function decline was age-related. (*See* Dkt.120-3 at 24.)

Ms. Devasia additionally failed to establish the standard of care. While the court treated her as providing "expert testimony" (1/27/12 Op. 8), she had never been identified or qualified as an expert by any party. Merely because a witness is sufficiently qualified to be an organization's designee, and is questioned about standards or policies, does not transform her into an expert witness. Moreover, there is no indication that Ms. Devasia's testimony opined on the standard of care, as opposed to the requirements of internal policies and procedures. (*See* Dkt.128-6, Dep. 74-75.) While "internal procedures may be admissible as *bearing on the* standard of care, . . . expert testimony [is] still required to establish that the internal policies . . . embodied the national standard of care and not a higher, more demanding one." *Jones v. AMTRAK*, 942 A.2d 1103, 1108 (D.C. 2008) (internal quotation marks and brackets omitted). The obligations that the District imposes on its case managers have not been shown to be mandated by the standard of care, which may have actually permitted greater reliance by the case manager on Symbral, and the professionals it retained, to oversee Mr. Suggs's medical care.

At most, Ms. Devasia's testimony might provide some evidence supporting the negligence and statutory claims. A jury would still have to decide these claims, weighing her testimony with all of the other evidence (*see supra* at 8-14) to find whether Mr. Harvey has met his burden of proof.

49

## II.     Even If Summary Judgment For Mr. Harvey Were Proper, The District Is Entitled To A New Trial On Damages.

### A.     The district court abused its discretion in excluding the District's evidence contesting causation.

Assuming that the District were properly held liable, the court committed legal error in preventing it from showing at trial that Mr. Suggs's health decline had not been proximately caused by its wrongful conduct.  The question for proximate cause is: "Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?"  *Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43, 53 (D.C. Cir. 2011).  After excluding the District's evidence on the issue of proximate cause, the court submitted the issue to the jury.  (4/18Tr. 65.)  "Error cannot be harmless where [as here] it prevents the defendant from providing an evidentiary basis for [its] defense."  *United States v. Sheehan*, 512 F.3d 621, 633 (D.C. Cir. 2008).

#### 1.     Decision against the laminectomy.

The court improperly excluded evidence explaining the decision against the laminectomy.  This evidence would have shown the decision to be an independent, intervening cause between the District's prior failure to monitor Symbral's care and Mr. Suggs's health decline.  Under Mr. Harvey's theory, the cervical stenosis was the cause-in-fact of Mr. Suggs's health decline, which only the laminectomy could have reversed.  The District's evidence would have shown, however, that his team decided

50

against the laminectomy based on its concern that the surgery would not benefit Mr. Suggs and on Ms. Weaver's refusal to consent.  (*See supra* at 11-12.)  And the District's expert, Dr. Jackson, would have testified that Ms. Weaver's refusal to consent was reasonable given the downsides of the surgery and its inability to have improved his condition.  (Dkt.167-3; Pretrial Statement 17.)  Because the court excluded all of this evidence (Supp. Pretrial Order 7-9), the jury heard only that the laminectomy should have been performed (*e.g.*, 4/16Tr. 35).  Instead of being allowed to consider evidence that the decision against the laminectomy was an intervening cause, the jury was erroneously directed to consider that decision as another wrongful act by the District, and thus an uncontested link in the causal chain.

The court's rationale for excluding the evidence at trial was legally erroneous. The court seemed to believe that it had already found on summary judgment that the District's failure to provide the laminectomy was deliberately "indifferent."  (4/10Tr. 124.)  In fact, though, the court made clear on summary judgment that it had not found deliberate indifference or negligence based on "the District's failure to provide Mr. Suggs a laminectomy."  (Pretrial Order 12.)  Nor could the court have properly held at trial that the failure to provide the laminectomy was wrongful as a matter of law.  The record evidence, and the evidence the District would have introduced, showed that the decision against the laminectomy was reasonable.  Mr. Suggs's team was legitimately concerned that the risk of further harm to Mr. Suggs from the surgery outweighed any

51

likely benefit (Dkt.150-6, MR207-08), Ms. Weaver validly refused to consent (*see supra* at 12, 38-39), and, indeed, multiple neurosurgeons later opined that Mr. Suggs would not have benefited from the surgery (Dkt.120-3 at 52; Dkt.150-2, Dep. 13-14, 37-38). At the very least, this evidence presented a jury question on proximate cause. The jury should have considered the complete picture.

   2. Pre-existing conditions.

   The District should have been permitted to show Mr. Suggs's health decline was attributable, at least in part, to his pre-existing cerebral palsy and scoliosis. The court denied the District's request to cross-examine Mr. Harvey's experts—who attributed his decline entirely to cervical stenosis—about whether these pre-existing conditions were alternate, independent factors. (4/10Tr. 115-17, 124.) Once again, the court erroneously decided this causation issue as a matter of law. (*Id*.) Even assuming that the court properly excluded the opinion testimony of the District's witness—Dr. Gersh—on this issue, the jury was not required to accept the testimony of Mr. Harvey's experts. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 151 (2000); *Collazo-Santiago v. Toyota Motor Corp*., 149 F.3d 23, 28 (1st Cir. 1998). Mr. Harvey paid each thousands of dollars for their testimony. (*E.g*., 4/16Tr. 31-32.) Mr. Suggs's health decline began around 1987, long before any indication of cervical stenosis. (Dkt.150-5, Dep. 13.) And the first neurologist report in 1997 had identified "late progression" of his cerebral palsy as possibly causing his decline. (Dkt.129-3 at

4.)  It was the jury's role, not the court's, to decide whether cervical stenosis actually and proximately caused all of the claimed damages.

### 3.    Dr. Gersh.

The court also abused its discretion in excluding Dr. Gersh's opinion testimony. (*See* Supp. Pretrial Order 9.)  When the District's expert disclosures were due in 2006, the Civil Rules did not require disclosure of the opinions of a treating physician, like Dr. Gersh.  Although Rule 26(a)(2)(C) was amended in December 2010 to require such disclosure, Mr. Harvey learned before trial, when Dr. Gersh was deposed, of his opinion that surgery would have risked further decline of Mr. Suggs's motor function and that the previous decline was consistent with advanced age in a cerebral palsy patient.  (Dkt.225.)  The court never found that Mr. Harvey suffered any prejudice; he and his experts were fully prepared to address Dr. Gersh's opinion at trial.  Under the circumstances, exclusion of the probative testimony of Mr. Suggs's treating physician was unjust, *see* Rule 86(a)(2)(B), and any non-compliance with the Rules was substantially justified or harmless, *see* Rule 37(c)(1).

### 4.    Pressure sores.

The court also improperly excluded evidence of an intervening cause for Mr. Suggs's pressure sores—Symbral's negligence. On summary judgment, it held that Symbral had negligently failed to prevent these sores, beginning in August 1997, by inadequate repositioning of Mr. Suggs.  (1/27/12 Op. 14-15.) When trial began, the

court found the District also responsible for the sores, not because there had been any failure to monitor Symbral's care related to the sores, but because Mr. Suggs's preceding decrease in motor function (purportedly due to cervical stenosis) contributed to the sores' development. (4/10Tr. 124.) Under that theory, though, Symbral's negligence was an intervening cause. By contract with the District, Symbral had assumed the duty to provide Mr. Suggs the daily care, and frequent repositioning, required to prevent those sores. Because the court already found Symbral negligent in performing this particular duty, the jury should have been permitted to consider its negligence as a superseding cause of the resulting harm. Contrary to the court's reasoning, Symbral's fault "matters." (4/10Tr. 128); *see Reiser v. District of Columbia*, 563 F.2d 462, 480 (D.C. Cir. 1977) (citing Restatement (Second) of Torts § 452(2) (1965)); *Siggers v. Barlow*, 906 F.2d 241 (6th Cir. 1990) (physician's liability for misdiagnosis defeated by second physician's intervening failure to notify patient of misdiagnosis).

### B.    The district court abused its discretion in instructing the jury on the District's probate lien.

The district court committed prejudicial error in instructing the jury on a probate lien filed by the District. The lien was filed under D.C. Code § 7-1303.11(a), which requires the cost of habilitation and care to be repaid if the person's family or estate is able. Over objection, the court instructed the jury that "any award of damages may be subject to a claim by the District that it is entitled to be repaid

54

$595,000 for the cost of care it provided to [Mr.] Suggs from 1994 to 2000." (4/18Tr.

64.)  Because the jury had never heard any evidence regarding the lien, the court's

instruction was error.  *See Moore & Hill, Inc. v. Breuninger*, 34 App. D.C. 86, 89

(D.C. Cir. 1909) ("[I]t is error to instruct a jury on a state of facts not disclosed by the

evidence.").  Without any information about the lien, the jury could only speculate

about how to apply it to their verdict.  Indeed, the instruction misleadingly suggests

that the lien had some relevance to the verdict, which it did not.  Thus, the jury could

only apply the instruction improperly, and in a way prejudicial to the District—by

inflating its damages award.

The district court had no legal basis for the instruction.  It believed the

instruction justified by the one approved in *Psychiatric Institute of Washington v.

Allen*, 509 A.2d 619 (D.C. 1986), that "any damage award will not be subject to

income taxation."  *Id.* at 627; *accord Schleier v. Kaiser Found. Health Plan*, 876 F.2d

174, 176 (D.C. Cir. 1989); (*see* 4/17Tr. 90-91; 4/24/13 Op. 15).  However, the District

waived any taxation instruction (4/17Tr. 90), and the court never gave one (*see* 4/18Tr.

62-67).  In any event, the approved taxation instruction addresses the high likelihood

that jurors would erroneously assume that their award would be subject to taxation

and "should be increased substantially [so] that the injured party is fully

compensated."  *Psychiatric Inst.*, 509 A.2d at 626.  But the problem that the taxation

instruction solves is the problem that the court's instruction here created.  By advising

55

the jury of a lien of which it would never have been aware, the court's instruction encouraged the jury to increase its award substantially and unjustifiably to "fully compensate" Mr. Harvey. *See Brooks v. Cook*, 938 F.2d 1048, 1050-53 (9th Cir. 1991) (error to advise jury that court would award fees or treble damages if verdict for plaintiff).

Assuming the instruction could be proper, the court erroneously permitted Mr. Harvey's highly improper use of it. As his closing argument's finale, he told the jury its role was to advocate for Mr. Suggs: "Your job is to speak for Curtis. That responsibility has been given to you as the jury." (4/18Tr. 48); *see Caudle v. District of Columbia*, 707 F.3d 354 (D.C. Cir. 2013) (granting new trial based on improper argument asking jurors to place themselves in a party's position). Mr. Harvey urged the jury to use the instruction on the lien to fulfill this "responsibility" and "hold the District accountable." (4/18Tr. 48.) He argued that the lien was "really amazing" and showed that "the District is so unwilling to accept [its] responsibility" that it "want[s] to get paid back money." (*Id.*) Mr. Harvey repeated *five* times in succession that the District "want[s]" to get "paid" back. (4/18Tr. 48-49.) He asked the jury to "think about all that, please, as you come up with a verdict." (4/18Tr. 49.) The court overruled the District's objection to this line of argument (4/18Tr. 48), thus indicating to the jury it could indeed use its verdict to penalize the District for seeking the lien.

56

The jury note shows that the jury followed Mr. Harvey's urging to consider the lien in calculating damages. In its brief deliberations, the jury asked the court just one question—whether the lien would be against its "gross award" or "net award." (Dkt.239.) The court denied, without explanation, the District's motion for mistrial and compounded its error by re-affirming for the jury that "any award" was subject to the lien. (4/18Tr. 77.) Because it is apparent that the erroneous instruction and improper argument had "a substantial and injurious effect or influence in determining the jury's verdict," reversal is required. *Caudle*, 707 F.3d at 361.

## III.    The District Court Misapplied The District's Entitlement to Contribution.

Assuming that the verdict stands (which it should not), the District was entitled to a 50% contribution against the entire verdict. The district court correctly recognized that, under District law, "there is a right of equal contribution among joint tortfeasors." (8/16/12 Order 2); *accord Estate of Kurstin v. Lordan*, 25 A.3d 54, 63 (D.C. 2011). "[T]o be joint tortfeasors, it is sufficient if their independent acts combined to cause a single injury." *Id.* The court found Symbral and the District to be joint tortfeasors because "the concurrent actions and omissions by both parties combined to create one indivisible injury"—Mr. Suggs's health decline. (8/16/12 Order 3-4.) Because Symbral settled with Mr. Harvey before trial (but after being found liable on summary judgment), the District is entitled, through its cross-claim

57

against Symbral, "to a pro rata [50%] credit against the verdict." *Estate of Kurstin*, 25 A.3d at 63.

The district court erred in granting the District a 50% contribution against only the verdict amount for which the District could be held liable in negligence. That amount, due to the court's idiosyncratic application of D.C. Code § 12-309, was $500,000 (resulting in a $250,000 credit). (8/16/12 Order 5-7.) The court did not award contribution against the entire verdict because "as a private, non-state actor, Symbral cannot be held liable as a matter of law under [Section] 1983 or D.C. Code § 7-1305.05(g)—the additional theories upon which the District's liability is premised." (8/16/12 Order 7.) But the theory of liability does not matter here. The court's finding that the District and Symbral were joint tortfeasors, responsible for one indivisible injury, suffices to establish a right to full and equal contribution. *Estate of Kurstin*, 25 A.3d at 63. This is not a case where, perhaps, contribution might be inequitable because the culpability of the District was so much greater than that of Symbral or because the District intentionally inflicted the injury. To the contrary, the District's liability was simply based on "periods of inaction" in monitoring Symbral, whereas Symbral was liable for its "day-to-day care of Mr. Suggs." (8/16/12 Order 3.) Therefore, at minimum, this Court should direct that the District receive a 50% credit against the entire verdict amount.

58

## CONCLUSION

This Court should reverse the judgment and fee award (which depends on the judgment under Section 1983) in favor of Mr. Harvey and direct the entry of judgment for the District or, alternatively, a new trial.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Carl J. Schifferle
CARL J. SCHIFFERLE
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6624

December 2013

## CERTIFICATE OF SERVICE

I certify that on December 16, 2013, electronic copies of this brief were served through the Court's ECF system, to:

Harvey S. Williams, Esq.
hsw@williamslegal.com

Marc Fiedler, Esq.
mfiedler@koonz.com

/s/ Carl J. Schifferle
CARL J. SCHIFFERLE

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,992 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point.

/s/ Carl J. Schifferle
CARL J. SCHIFFERLE