NOT YET SCHEDULED FOR ORAL ARGUMENT
_____

NOS. 13-7082, 13-7090, 13-7101, 13-7111
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

DAVID HARVEY,
**Appellee & Cross-Appellant,**

**v.**

DISTRICT OF COLUMBIA,
**Appellant & Cross-Appellee,**
_____

ON APPEALS FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
_____

**BRIEF FOR APPELLEE/CROSS-APPELLANT DAVID HARVEY**
_____

Marc Fiedler
KOONZ, MCKENNEY, JOHNSON,
  DEPAOLIS & LIGHTFOOT, L.L.P.
2001 Pennsylvania Avenue, N.W.
Suite 450
Washington, D.C. 20006
(202) 659-5500
mfiedler@koonz.com

Harvey S. Williams
WILLIAMS BERTRAM
1666 Connecticut Ave., N.W. Ste. 250
Washington, D.C. 20009
202-462-5900
hsw@williamslegal.com

*Counsel for Appellee/Cross-Appellant*

## Certificate as to Parties, Rulings, and Related Cases

A. *Parties and amici.*  David Harvey, individually and as personal representative of the estate of Curtis Suggs, was the plaintiff below and is appellee/cross-appellant here.  The District of Columbia was a defendant below and is appellant/cross-appellee here.  Leon Mohammed, Yvonne Mohammed, and Symbral Foundation for Community Service, Inc. were defendants below but settled with Mr. Harvey. (Dkt.191.)  Donald Egbuonu, M.D., was also named as a defendant and is appellee here.  There are no amici.

B. *Ruling under review.*  The District appeals from the following rulings in the district court (Lamberth, J.): the judgment entered on August 16, 2012 (Dkt. 249) and the memorandum opinion and order of April 24, 2013 (Dkt. 290; Dkt. 291) denying the District's motion for a new trial or in the alternative for remittitur, and any and all orders merged into the foregoing.  Mr. Harvey cross-appeals from the March 22, 2012 pretrial order (Dkt. 196) striking certain claims. The District separately appeals, and Mr. Harvey cross appeals, from the memorandum opinion and order of June 26, 2013 (Dkt. 300; Dkt. 301) granting in part and denying in part Mr. Harvey's motion for attorney's fees and costs.

C. *Related cases.*  This case has not been before this Court or any other court other than the district court below.  Undersigned counsel is unaware of any related cases pending in this Court or any other court.

i

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases………………………..      i

Table of Contents……...………………………………………………….      ii

Table of Authorities………………………………………………………..      v

Glossary…………………………………………………………………      xi

Jurisdictional Statement ………………………………………………      1

Statement of Issues………………………………………………………      1

Statement of the Case……………………………………………………      3

Statement of the Facts……………………………………………………      6

   1.    The District failed to serve the needs of persons with
developmental disabilities who were involuntarily committed
to its care. ……...……………………………………………….........      6

2.    Mr. Suggs was involuntarily committed to the District's
care. ………………………………………………………………      12

3.    The District failed to ensure that Mr. Suggs received
recommended medical care. ……………………………………..      16

Standards of Review……………………………………………….........      22

Summary of Argument…………………………………………………..      23

Argument………………………………………………………………..      28

1.    Mr. Harvey was entitled to summary judgment on his
Civil Rights Act and negligence claims. ………….................................      28

      A.    The district court properly held the District liable
for violating Mr. Suggs's constitutional rights. …………………      28

1.  The Constitution imposed on the District a duty
    of care and protection as to Mr. Suggs. ..................... 29

2.  Mr. Suggs's constitutional right to medical care
    was violated. ....................................................... 34

3.  The District's custom of deliberate indifference to
    the needs of *Evans* class members was the
    moving force behind its violation of Mr. Suggs's
    constitutional rights. ........................................... 50

B.  The district court properly granted summary judgment
    on the negligence claims. ....................................... 56

    1.  Mr. Harvey's presuit notices complied with the
        applicable statute. ............................................. 56

    2.  The District is not entitled to judgment on the
        statutory negligence claim. ................................... 59

    3.  The evidence established the District's negligence
        as a matter of law. ............................................. 60

2.  The district court did not abuse its discretion in denying
    the District's motion for a new trial. ............................ 63

    A.  The district court properly excluded the District's
        evidence on causation. ......................................... 63

    B.  The district court properly instructed the jury on the
        District's probate setoff. ...................................... 67

3.  The court correctly applied a $250,000 credit to the
    judgment against the District. ................................... 69

4.  The district court miscalculated the award of attorney's
    fees and costs. .................................................... 71

Conclusion................................................................... 72

iii

Certificate of Service

Certificate of Compliance

Addendum of Statutes and Regulations

# Table of Authorities*

**Cases**
**Page**

*Ark Initiative v. Tidwell,*
  749 F.3d 1071 (D.C. Cir.2014)…………………………….………22

\*Baker v. District of Columbia,*
  326 F.3d 1302 (D.C. Cir. 2003)………..…………..29, 34, 38, 39, 50

*Bell v. United Princeton Props., Inc.*,
  884 F.2d 713 (3d Cir.1989)………………….………………….72

*Berg v. Footer,*
  673 A.2d 1244 (D.C.1996)………………..……………………..23

*Boring v. Kozakiewicz,*
  833 F.2d 468 (3rd Cir. 1987)…………..………………….…..40

*Butts v. United States,*
  822 A.2d 407 (D.C. 2003)………………….…………………...63

*George Washington Univ. v. Lawson,*
  745 A.2d 323 (D.C. 2000)………………….………………...68

*Chesapeake & Potomac Tel. Co. v. Clay,*
  194 F.2d 888 (D.C. Cir. 1952)………………..………………60

*City of Canton v. Harris,*
  489 U.S. 379 (1989)………………………….…….…....…..28, 50

*Conseil Alain Aboudaram, S.A. v. de Groote,*
  460 F.3d 46 (D.C. Cir. 2006)…………..……….……………23

*County of Sacramento v. Lewis,*
  523 U.S. 833 (1998)………………..………………………..31, 33

\*     Authorities chiefly relied upon.

*Czekalski v. LaHood*,
    589 F.3d 449 (D.C. 2009)……………..…………………………..23

∗*Daskalea v. District of Columbia*,
    227 F.3d 433 (D.C. Cir. 2000)…………..………………....22, 28, 53

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*.,
    89 U.S. 189 (1989)……………..……………………………....29, 32

*District of Columbia v. Barriteau*,
    399 A.2d 563 (D.C. 1979)…………….………………………...…67

*District of Columbia v. Wash. Hosp. Ctr*.,
    722 A.2d 332, 337 & n.5 (D.C. 1998)………..……………………66

*Dyson v. District of Columbia*,
    710 F.3d 415 (D.C. Cir. 2013)…………………..…………….…57, 59

*Estelle v. Gamble*,
    429 U.S. 97 (1976)……………………………..………………..29

*Evans v. Fenty*,
    701 F. Supp. 2d 126 (D.D.C. 2010)……........7, 11, 12, 24, 30, 52, 53

.

*Evans v. Barry*,
    No. 76-CV-293, 1996 WL 451054
    (D.D.C. Aug. 2, 1996)……………..……………………..9, 10, 52

*Evans v. Washington*,
    459 F. Supp. 483 (D.D.C. 1978) ………..…….6, 7, 31, 32, 51, 52, 62

*Evans v. Williams*,
    139 F. Supp. 2d 79 (D.D.C. 2001)……………..…….…10, 11, 51, 52

*Farmer v. Brennan*,
    511 U.S. 825 (1994)………………………..……...38, 39, 40

*Green Leaves Rest., Inc. v. 617 H St. Assoc*.,
    974 A.2d 222, 238 (D.C. 2009)………………………….………...70

*Gutierrez v. Peters,*
    111 F.3d 1364 (7th Cir. 1997)……………………….………...40, 47

*Harvey v. Mohammed,*
    841 F. Supp. 164 (D.D.C. 2012)…………………………..…….……5, 58

*Harvey v. Mohammed,*
    941 F. Supp. 2d 93 (D.D.C. 2013)………………..……….6, 68,69

*Harvey v. Mohammed,*
    951 F. Supp. 2d 41 (D.D.C. 2013).........................................6, 71, 72

*Haynes v. Williams,*
    392 F.3d 478 (D.C. Cir. 2004)………………………..…………...62

*Hicks v. United States,*
    511 F.2d 407 (D.C. Cir. 1975)………………………..…………....67

*Hooks v. Wash. Sheraton Corp.,*
    578 F.2d 313 (D.C. Cir. 1977)……………..………………………...69

*Howard Univ. v. Good Food Servs., Inc.,*
    608 A.2d 116 (D.C. 1992)……………………….……………….…...69

*Huthnance v. District of Columbia,*
    722 F.3d 371 (D.C. Cir. 2013)………………….…………..….…..22

*Johnson v. Karnes,*
    398 F.3d 868 (6th Cir. 2005)………………………….…………...42

*Lewis v. Washington Metro. Area Transit Auth***.**
    19 F.3d 677 (D.C. Cir. 1994)………………….….……………..63

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978)……………………………..……………....28

*Patten v. Nichols,*
    274 F.3d 829 (4th Cir. 2001)……………………….……………...40

*Payne v. District of Columbia Gov't,*
  722 F.3d 345 (D.C. Cir. 2013)……………………..………………58

*Reed v. Cameron,*
  380 F. App'x 160 (3d Cir. 2010)……………………....…………43

*Smith v. District of Columbia,*
  413 F.3d 86 (D.C. Cir. 2005)………………...…….31, 32, 33, 34, 55

*Speer v. City of Wynne,*
  276 F.3d 980 (8th Cir. 2002)……………………..…………………39

*Thomas v. Cook Cnty. Sheriff's Dep't,*
  604 F.3d 293 (7th Cir. 2009)…………..……………………………....38

*United States v. Crawford,*
  533 F.3d 133 (2d Cir. 2009)……………………..…………………...68

*United States v. Hall,*
  610 F.3d 727 (D.C. Cir. 2010)……………………..……………..68

*United States v. Project on Gov't Oversight,*
  616 F.3d 544 (D.C. Cir. 2010)……………………..………………...59

*Walter Int'l Prods., Inc. v. Salinas,*
  650 F.3d 1402 (11th Cir. 2011)……………………… …………..66

*Washington v. District of Columbia,*
  429 A.2d 1362 (D.C. 1981)……………………….……….56, 57, 59

*Ware v. Jackson Cnty.,*
  150 F.3d 873 (8th Cir. 1998)...........................................................53

*Washington v. Washington Hosp. Ctr.,*
  579 A.2d 177 (D.C. 1990)……………………………….…………...69

*West v. Atkins,*
  487 U.S. 42 (1988)...……………………………….…………..28

*West v. Potter,*
    717 F.3d 1030 (D.C. Cir. 2013)…………………..…………..23

*Wharton v. District of Columbia,*
    666 A.2d 1227 (D.C. 1995)…………………….……………....56

*Williams v. United States Elevator Corp.,*
    920 F.2d 1019 (D.C. Cir. 1990)………………..……………..22

*Yellow Cab Co. of D.C. v. Dreslin,*
    181 F.2d 626 (D.C. Cir. 1950)………..……………………...69

*\*Youngberg v. Romeo*
    457 U.S. 307 (1982)………..…………………………..29, 30, 33, 39

## Statutes

28 U.S.C. § 1331………………..…………………………………1

28 U.S.C. § 1367………………..…………………………………1

42 U.S.C. § 1983………..……..…..1, 4, 5, 28, 29, 34, 38, 39, 50, 53, 56, 70

42 U.S.C. § 1988(b)…………………………..…………………..71

Act of Oct. 22, 1970, Pub. L. No. 91-490, § 1(1)(C),
84 Stat. 1087……………………….…………..…………...……1, 13

D.C. Code § 7-1301.02………………..….………….…………4, 13

D.C. Code § 7-1303.08………………….……………..………..32

D.C. Code § 7-1303.09………………….……………..………..32

D.C. Code § 7-1303.10……………………..……………..32

D.C. Code § 7-1304.11……………………………..………..32

D.C. Code § 7-1305.05(g)……………….……………..………....59

ix

D.C. Code § 7-1305.14…………………………………………………..…………5

D.C. Code § 7-1305.14(c)…………………………………………..………59

D.C. Code § 12-309……………………………………..………...25, 56, 57

D.C. Code § 21-1101 (1967)…………………………………………..………13

D.C. Code § 21-1108 (1967)…………………………………………..………13

D.C. Code § 21-1113 (1967)…………………………………..………....13

**Rules**

Fed. R. Civ. P. 30(b)(6)……………………………………..………....61

Fed. R. Civ. P. 37(c)(1)……………………………………………..………66

Fed. R. Civ. P. 61...................................................................68

Fed. R. Civ. P. 86(a)……………………………………………..…..65

Fed. R. Evid. 702……………………………………………..………....61, 66

**Other Authorities**

Boo, Katherine, *Invisible Lives|D.C.'s Troubled System*
*for the Retarded: Forest Haven Is Gone, But the Agony*
*Remains*, Wash. Post, Mar. 14, 1999, at A1, *available at*
http://www.pulitzer.org/archives/6369 …………………………………9

Boo, Katherine, *Invisible Lives|D.C.'s Troubled System*
*for the Retarded: Residents Languish; Profiteers Flourish*,
 Wash. Post, Mar. 15, 1999, at A14, *available at*
http://www.pulitzer.org/archives/6372 ...…………………………………9

# Glossary

| | |
|---|---|
| C2 | Second cervical vertebra |
| ICF/MR | Intermediate Care Facility for Mentally Retarded Individuals |
| IHP | Individual Habilitation Plan |
| IDT | Interdisciplinary Team |
| MRDDA | Mental Retardation and Developmental Disabilities Administration |
| MRI | Magnetic Resonance Imaging |
| UCP | United Cerebral Palsy |

## Statement of Jurisdiction

The plaintiff, David Harvey, brought this action as the personal representative of the estate of Curtis Suggs and asserted claims under 42 U.S.C. § 1983, several District of Columbia statutes, and the common law.  (Dkt. 2.)  The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.  On April 24, 2013, the court denied the defendant District of Columbia's posttrial motion. (Dkt. 290.)  The District appealed on May 20, 2013.  (No. 13-7082.)  Mr. Harvey timely cross-appealed on June 3, 2013.  (No. 13-7090.)  On June 26, 2013, the district court partially granted Mr. Harvey's motion for attorney's fees and costs. (Dkt. 300.)  The District filed another notice of appeal on June 28, 2013. (No. 13-7101.)  On July 29, 2013, Mr. Harvey timely filed another notice of cross-appeal. (No. 13-7111.)

## Statement of the Issues

1.  Whether the district court properly entered summary judgment against the District on the Civil Rights Act claim where the District owed to Mr. Suggs a substantive-due-process duty of care, and where there is no genuine issue of material fact that the District had a custom of deliberate indifference to the needs of persons with intellectual disabilities, such as Mr. Suggs, who were

1

involuntarily committed to its custody, and that custom was the moving force behind the violation of Mr. Suggs's constitutional rights.

   2.  Whether the district court properly entered summary judgment on the negligence claims where the presuit notices satisfied the statutory requirements, the district court limited the recovery of damages under the common-law negligence claim to the time period urged by the District, the intellectual-disabilities-rights statute expressly imposes liability for negligence, and the evidence from two well-qualified experts who are familiar with the national standard of care and who identified the District's specific violations of the standard adequately supported a finding of negligence.

   3.  Whether the district court properly denied the District's motion for a new trial where the District never designated a causation expert, never made the required disclosures of a treating physician's opinions, could not as a matter of law show any superseding cause of Mr. Suggs's injuries, and was permitted to extensively cross-examine Mr. Suggs's experts on alternative causes of his health problems, and where the court gave a proper jury instruction on the District's probate lien, which the District cannot show was prejudicial.

   4.  Whether the district court properly denied the District a 50% credit on the verdict returned under the Civil Rights Act where the group home was not subject to liability under that statute.

5.  Whether the district court erred in reducing the requested award for fees and costs where the court made several computational miscalculations.

## Statement of the Case

From the late 1970s through the first decade of this century, the District of Columbia continually violated the constitutional rights, including the right to medical care, of persons with intellectual disabilities who had been involuntarily committed to the District's care.  In a class-action lawsuit seeking relief from those violations, the District admitted that its system of care was "broken," "highly dysfunctional," and "unable to execute its mission at its most basic level." Among other things, the District's case managers were not monitoring the delivery of services to class members to ensure that they were receiving recommended medical care.  The District repeatedly promised to fix the system, but repeatedly broke those promises, and so was repeatedly held in contempt. The District acknowledged that its systemic failures were adversely affecting its vulnerable clients.

Among the victims of the District's neglect was Curtis Suggs, a man with a profound intellectual disability who was involuntarily committed to the care and custody of the District of Columbia and whom the District had placed in a group home operated by the District's contractor.  After Mr. Suggs showed signs of a serious neurological disorder — including the loss of strength in his arms to the

3

point that he could no longer feed himself — the District failed to ensure that he received physician-recommended medical care. Appointments to diagnose and treat his condition were delayed for months and even years. For nearly five years, the District ignored the recommendations of medical professionals, including the recommendations of two neurosurgeons and a neurologist that surgery to relieve Mr. Suggs's neurological condition be undertaken "ASAP." The untreated neurological condition eventually paralyzed Mr. Suggs's diaphragm and caused his death.

Plaintiff-Appellee/Cross-Appellant David Harvey brought this action in his role as Personal Representative of the Estate of Curtis Suggs. (Dkt. 2.) Named as defendants were Mr. Suggs's former caretakers, including the District of Columbia, into whose custody Mr. Suggs had been committed; Symbral Foundation for Community Services, Inc. ("Symbral"), which operated a group home into which the District had placed Mr. Suggs; and the officers of Symbral. (Dkt. 2, at 1, 3-4.) Mr. Harvey asserted claims under 42 U.S.C. § 1983, D.C. Code § 7-1301.02 et seq., federal and District of Columbia statutes regulating community residential facilities, and the common law of the District of Columbia, seeking compensatory and punitive damages against the defendants. (Dkt. 2, at 2, 6-22.)

District Court Chief Judge Royce C. Lamberth granted partial summary judgment for Mr. Harvey. *Harvey v. Mohammed*, 841 F. Supp. 2d 164 (D.D.C. 2012). The court held for Mr. Harvey as to his negligence claims against the District, Symbral, and Symbral's officers, and his § 1983 claim against the District. *Id.* at 174-79, 184-89. The court denied the defendants' motions for summary judgment as to Mr. Harvey's claim under D.C. Code § 7-1305.14 and later held for him as a matter of law on this count. *Id.* at 189-90; Dkt. 196, at 13. As to the negligence and § 7-1305.14 claims, the court held that the District of Columbia presuit-notice statute barred recovery for injuries occurring before December 23, 1999 such that recovery was limited from that date through Mr. Suggs's death on June 30, 2000. *Harvey*, 841 F. Supp. 2d at 190-92. The court granted summary judgment to the defendants on Mr. Harvey's other claims. *Id.* at 179-84. Symbral and its officers settled before trial. (*See* Dkt. 221.)

A trial was held in April 2012 to determine the amount of compensatory damages owed to Mr. Harvey for the District's negligence and violation of § 1983. The jury awarded $2.9 million in compensatory damages, of which $500,000 was for the period December 23, 1999 to June 30, 2000. (Dkt. 241.)

The District moved to reduce the verdict by 50% based on Symbral's settlement with Mr. Harvey. The court held that the District was entitled to a

$250,000 credit, thus entering judgment against the District in the amount of $2.65 million.  (Dkt. 248.)

    The District moved for a new trial on damages or for remittitur.  (Dkt. 252.) The district court denied the motion.  *Harvey v. Mohammed*, 941 F. Supp. 2d 93 (D.D.C. 2013).

    Mr. Harvey moved for an award of fees and costs in the sum of $1,675,946.55. (Dkt. 276.)  The district court awarded $1,118,976.30, but in reducing the requested amount the court made several computational errors.  *Harvey v. Mohammed*, 951 F. Supp. 2d 47 (D.D.C. 2013).

## Statement of the Facts

### 1.  The District failed to serve the needs of persons with developmental disabilities who were involuntarily committed to its care.

    In 1976, residents of Forest Haven, then the District's institution for persons with developmental disabilities, filed a class action alleging that they were receiving constitutionally deficient care, treatment, education, and training.  Mr. Suggs was a member of that class.  In 1978, the district court entered a consent decree under which the District agreed that the constitutional rights of Forest Haven residents had been violated and that it would take specific actions to remedy those violations.  *Evans v. Washington*, 459 F. Supp. 483, 484 (D.D.C. 1978).  The District acknowledged it had violated the class members' right under

6

the Due Process clause of the Fifth Amendment "to be kept free from harm." *Id*.

The District agreed, among other things, to comply with "[a] program of medical,

dental and health related services for class members which provides accessibility,

quality and continuity of care for physical illness or injury." *Id*. at 489. The

District "consented to the entry of [the 1978 Consent Order] so as to assure

protection of the rights of plaintiffs." *Id*. at 484.

   "A series of consent orders and remedial plans followed in which defendants

admitted that they were still violating class members' constitutional rights and

agreed to take additional actions to remedy those constitutional violations."

*Evans v. Fenty*, 701 F. Supp. 2d 126, 128-29 (D.D.C. 2010). In 1990 and again in

1995, the district court held the District in civil contempt for consistently

violating the consent orders because, among other things, it permitted inadequate

case-manager-to-client ratios. *Id*. at 131; (Dkt. 132-7, at 3-9; *see also* Dkt. 129-

16, at 5 (documenting that "[c]aseloads for case managers exceed the court-

mandated ratio of 1:60" and that "[s]uch high caseloads effectively preclude case

managers from providing the individualized attention required by class

members")). The court noted that, although "[d]efendants admit that they also are

required to provide adequate medical care" to the class members, "[d]efendants

have not met their responsibilities in the . . . provision of adequate medical,

dental, and health services." (Dkt. 132-7, at 7; *see also* Dkt. 130-1, at 17; Dkt.

7

129-16 (documenting "the overall failure of the District of Columbia to safeguard clients' rights to health/safety," identifying specific failures to provide health care and medical equipment to class members, and noting "actual and potential harm to class members").)

Subsequently, the Court Monitor found that the District continued to have an inadequate number of case managers, continued to fail to properly train its case managers to recognize when class members' needs were not being met, and still had no comprehensive quality-assurance system as required by the consent orders. (Dkt. 130-1, at 19-43.) The Court Monitor also noted continuing difficulties and delays in obtaining medical appointments and services for class members. (Dkt. 130-1, at 26, 33, 39-40, 43.)

In 1996, the district court observed that the District's contemptuous noncompliance with the consent orders was adversely affecting vulnerable class members:

> Defendants have, for over two years, chronically and unapologetically violated the terms of nearly every aspect of this Court's multiple Consent Orders. Defendants' unrelenting contempt of this Court's orders, and their seeming inability to bring themselves into compliance therewith, have created chaos for the care providers vested with day-to-day responsibility for the members of this plaintiff class. The plaintiffs comprising this class, as defendants well know, are ill-equipped to adjust to or defend against the city's failure to assist their care providers in giving them the care and treatment they desperately need.

*Evans v. Barry*, No. 76-CV-293, 1996 WL 451054, at \*1-\*2 (D.D.C. Aug. 2, 1996).

In 1997, the Court Monitor "continue[d] to find that class members are frequently denied necessary health services and/or adaptive equipment, sometimes resulting in physical injury." (Dkt. 130-1, at 45-47.)

In 1999, the Washington Post published a Pulitzer Prize winning series of articles that shed light on the District's systemic failures, including poor monitoring of the group homes, and that described how group-home staff delayed or withheld medical treatment and missed medical appointments for residents with sometimes fatal consequences. Katherine Boo, *Invisible Lives|D.C.'s Troubled System for the Retarded: Forest Haven Is Gone, But the Agony Remains*, Wash. Post, Mar. 14, 1999, at A1, *available at* http://www.pulitzer.org/archives/6369; Katherine Boo, *Invisible Lives|D.C.'s Troubled System for the Retarded: Residents Languish; Profiteers Flourish*, Wash. Post, Mar. 15, 1999, at A14, *available at* http://www.pulitzer.org/archives/6372.

In a review of group homes covering the years 1998 through 2000, the District of Columbia Auditor found that:

- "Case management ratios are too high."

9

- Group homes "fail[] to provide or obtain preventive and general medical care for clients[.]"

- The Mental Retardation and Developmental Disabilities Administration ("MRDDA") "system of monitoring is placing clients at risk."

- "The monitoring of care provided to MRDDA's clients needs improvement."

(Dkt. 131-2, at 3-5, 7.)

In December 2000, the District stipulated in *Evans* that there had been "serious breakdowns" in the District's system of support for individuals with developmental disabilities; that these breakdowns "had been 19 years in the making" and "cover 20 years of neglect and mismanagement"; that the system was "broken," "highly dysfunctional," "incapable of providing quality service," and "unable to execute its mission at its most basic level"; and that these problems were "egregious." *Evans v. Williams*, 139 F. Supp. 2d 79, 96-98 (D.D.C. 2001). Agreeing that "[m]any of the requirements of the *Evans* Court Orders are not being complied with," the District stipulated to several systemic failures, including the following:

- "MRDDA employees have not been provided adequate training for the[ir] jobs . . . ."

- "The management and oversight of both District employees and private sector providers has been inadequate."

- "There are insufficient numbers of employees [including case managers] in the District's system to do the work required."

- "Case managers do not visit all customers on their caseloads at least once per quarter per MRDDA policy."

- "MRDDA staff do not always track down the outcome of matters referred for action."

*Id*. at 100-07.

The District admitted that "two decades of neglect in the District's system has taken a toll on the clients served in the system," and that "[t]he District government has fundamentally failed its obligation to disabled persons and their families." *Id*. at 97. The District acknowledged that "[t]he Mayor and his administration were aware of problems in the District's Mental Retardation and Developmental Disabilities Administration" and that "[t]he District was aware of problems of poor care provided at group homes, systemic failures and other issues as a result of a *Washington Post* article in February 1999." *Id*. at 96-97.

Nevertheless, the District's "'systemic, continuous, and serious noncompliance'" with the court's orders continued for years more, leading the district court to observe that the District "has a proven 30-year history of

11

noncompliance." *Evans*, 701 F. Supp. 2d at 138 (internal quotation marks and citation omitted), 141-48, 168, 169 n.43 (noting "the District's lengthy history of intransigence and noncompliance").

## 2.  Mr. Suggs was involuntarily committed to the District's care.

Curtis Suggs was born on May 12, 1932 and was diagnosed with profound mental retardation, cerebral palsy, seizure disorder, scoliosis, presbyopnia, and hearing loss.  (Dkt. 131-5, at 6; Dkt. 129-5, at 4.)  When he reached adulthood, he had the functional capacity approximately that of a two-year-old child, was "incapable of caring for himself," and "need[ed] constant care and supervision so he w[ould] not harm himself or others."  (Dkt. 123-1, at 44.)  After the death of his parents, he lived with his sister, Carrie Weaver.  (Dkt. 128-2, at 4-5.)  Upon her application, the District filed a petition on May 10, 1967, to have Mr. Suggs committed to the District's custody because his family could no longer care for him.  (Dkt. 123-1, at 9; Dkt. 128-2, at 4-5.)  The petition was filed under a statute that governed the involuntary commitment of persons with intellectual disabilities to the District's custodial care.  (Dkt. 130-2, at 2-3.)  In accordance with the statute, two physicians certified that Mr. Suggs qualified for the petitioned commitment because of his mental condition.  (Dkt. 128-2, at 6, 10.)  On May 24, 1967, the district court for the District of Columbia entered a decree ordering Mr. Suggs to be committed to the District Training School (Dkt. 128-2, at 11), which

12

in 1970 became known as Forest Haven.  Act of Oct. 22, 1970, Pub. L. No. 91-490, § 1(1)(C), 84 Stat. 1087, 1087.  The court found Mr. Suggs to be "a feeble-minded person" within the meaning and intent of D.C. Code § 21-1108 (1967) who "requires supervision, control, and care."  (Dkt. 128-2, at 11.)  The statute defined a "feeble-minded person" as "a person afflicted with mental defectiveness from birth or from an early age so pronounced that he is incapable of managing himself and his affairs, or being taught to do so, and who requires supervision, control, and care for his own welfare."  D.C. Code § 21-1101 (1967).  The court's decree was "binding upon all persons it may concern until rescinded or otherwise superseded or set aside."  D.C. Code § 21-1108 (1967).  Once committed, Mr. Suggs was not free to leave without a court order discharging him.  D.C. Code § 21-1113 (1967).

After enactment of the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, D.C. Code § 7-1301.02 et seq. ("D.C. Law 2-137"), the Mental Retardation and Developmental Disabilities Administration was designated as the District agency responsible for the care and habilitation of persons legally committed to its custody.  (Dkt. 128-5, at 3.)  The MRDDA administrator served as Mr. Suggs's legal guardian.  (Dkt. 130-3, at 3, 5, 7, 11.)

In October 1983, after the District had been ordered to place Forest Haven residents in community residential facilities, the District transferred Mr. Suggs

from Forest Haven, where he had been residing (Dkt. 120-3, at 11-12), to an

Intermediate Care Facility for Mentally Retarded Individuals ("ICF/MR"). (Dkt.

150-6, at 371.) In October 1984, the District placed him in a group home on Blair

Road in Washington, D.C. operated by Symbral Foundation for Community

Services, Inc. (Dkt. 120-3, at 14-15; Dkt. 150-6, at 360.) Symbral operated the

Blair Road home as an ICF/MR under annual contracts with the District of

Columbia, by which Symbral agreed to provide room, board, intermediate-care

nursing services under a planned program of care, and supervision on a round-

the-clock basis. (Dkt. 120-3, at 15; Dkt. 123-1, at 11-12.)

Although MRDDA contractually delegated the day-to-day responsibility for

Mr. Suggs's care and habilitation to Symbral, MRDDA remained the agency

legally responsible for Mr. Suggs. (Dkt. 128-5, at 3; Dkt. 128-8, at 12.) MRDDA

assigned to Mr. Suggs a case manager who was responsible for overseeing all the

components of Mr. Suggs's individual habilitation plan ("Plan" or "IHP"), which

was an annual written plan that detailed his strengths, weaknesses, and goals

based on assessments by therapists, clinicians, and other health-care

professionals. (Dkt. 128-5, at 3; Dkt. 128-6, at 6, 12; Dkt. 120-3, at 16.) The

Plan was developed by the Inter-Disciplinary Team ("Team" or "IDT")

comprising the MRDDA case manager, certain Symbral staff, and clinicians such

as a nurse, a speech pathologist, and a physical therapist. (Dkt. 128-8, at 6-7, 9-

14

10.)  Also on the Team was a representative from United Cerebral Palsy ("UCP"), which operated a daycare program where Mr. Suggs typically spent each weekday.  (Dkt. 120-3, at 16.)  The Team monitored Mr. Suggs's condition and care.  (Dkt. 120-3, at 16.)

   Mr. Suggs's MRDDA case manager was responsible for overseeing all components of Mr. Suggs's Plan and, with other MRDDA units, ensuring that Mr. Suggs's needs were met.  (Dkt. 128-5, at 3.).  The case manager was required to participate in the Plan meetings, coordinate and monitor the Plan, make sure that all of Mr. Suggs's needs were being addressed, ensure that all the recommendations were included in the Plan, and approve the Plan document. (Dkt. 128-8, at 9-10; Dkt. 128-9, at 2-3.)  Additionally, the case manager was responsible for monitoring the implementation of the Plan, coordinating the delivery of services, and ensuring that all recommended services — including medical services — were provided to Mr. Suggs.  (Dkt. 128-6, at 6-7; Dkt. 128-8, at 3, 9-13; Dkt. 128-9, at 2; 130-11, at 15.)  The case manager was required to inform Symbral and the case manager's supervisor if Mr. Suggs was not receiving medical care and services in accordance with his Plan.  (Dkt. 128-8, at 4.)  If the case manager learned that a recommended medical appointment was not made or kept, the case manager was to follow up with the group-home staff.  (Dkt. 128-6, at 7.)  Mr. Suggs's MRDDA case manager was required to review the Plan

15

quarterly (Dkt. 128-8, at 11) and to visit him at least four times per year to carry out these responsibilities.  (Dkt. 128-6, at 6.)  The case manager was also required to advocate for Mr. Suggs's rights and give voice to his needs.  (Dkt. 128-8, at 3.) Sarah Jenkins was Mr. Suggs's assigned MRDDA case manager until 1998, when she was replaced by Shireen Hodge.  (Dkt. 120-3, at 16.)

**3.     The District failed to ensure that Mr. Suggs received recommended medical care.**

In 1994, the Plan for Mr. Suggs reported that he was in good health and could feed himself.  (Dkt. 131-5, at 11-12.)  The 1995 and 1996 Plans for Mr. Suggs reported that his condition had begun to deteriorate — he lost strength in his upper extremities, became dependent on staff to feed him, and became incontinent.  (Dkt. 128-6, at 14; Dkt. 131-6, at 12-13; Dkt. 131-7, at 12.)  In September 1995, Mr. Suggs's physical therapist at the UCP day program noted a decline in his upper-body strength and recommended a neurology consultation to determine the cause of the decrease.  (Dkt. 128-14.)  On March 5, 1996, Sarah Jenkins, Mr. Suggs's MRDDA case manager, met with Mr. Suggs's Team and noted the UCP physical therapist's recommendation for a neurology evaluation. (Dkt. 130-7, at 6.)  Although the Team recognized Mr. Suggs's inability to feed himself due to his loss of motor function, and the neurology-evaluation recommendation was repeated at Mr. Suggs's 1996 Plan meeting, neither the

16

Team nor Ms. Jenkins included that recommendation in the 1996 Plan.  (Dkt. 129-1; Dkt. 131-7.)  As Mr. Suggs's case manager, Ms. Jenkins should have ensured that this recommendation was included in the Plan and implemented. (Dkt. 128-6, at 14.)  Ms. Jenkins and her supervisor nevertheless signed off and approved the deficient 1996 Plan.  (Dkt. 131-7, at 1.)

On February 19, 1997, the UCP coordinator notified Ms. Jenkins that the neurology consult had never occurred and that the neurology-evaluation recommendation was missing from Mr. Suggs's 1996 IHP.  (Dkt. 129-1.)  While the District ignored these recommendations, Mr. Suggs's medical condition continued to deteriorate.  (Dkt. 131-7, at 12; Dkt. 128-6, at 14; Trial Tr. 120-39, Apr. 11, 2011.)

On February 24, 1997, the Health Care Finance Administration issued a deficiency notice to Symbral for failing to promptly schedule the neurology consult in 1995.  (Dkt. 129-2, at 4-9.)  On March 5, 1997, Symbral responded that a neurology appointment for Mr. Suggs was scheduled for March 7, 1997 and that Symbral would "make all medical appointments within one month of the recommendation."  (Dkt. 129-2, at 7.)  Ms. Jenkins, as his case manager, was responsible for making sure these recommendations were followed, (Dkt. 128-5, at 3; Dkt. 128-6, at 6-7).

17

On March 7, 1997, Mr. Suggs was examined by neurologist Kenneth Plotkin, M.D.  (Dkt. 129-3, at 3-4.)  Dr. Plotkin noted that Mr. Suggs had decreased muscle tone, decreased use of his upper extremities, inability to feed himself, and inability to ambulate anymore.  (Dkt. 129-3, at 3-4.)  Dr. Plotkin diagnosed cervical stenosis (compression of the cervical spine) as a suspected cause of Mr. Suggs's symptoms; he recommended that an X-ray and MRI be taken of Mr. Suggs's cervical spine as soon as possible.  (Dkt. 129-3, at 4.)  These imaging tests, however, were not promptly scheduled.  On April 1, 1997, Dr. Plotkin repeated his recommendation that an X-ray and MRI of Mr. Suggs's cervical spine be done "ASAP."  (Dkt. 129-3, at 5.)  On April 18, 1997, the recommended MRI was finally conducted and, as predicted, showed severe compression at the C2 level of Mr. Suggs's spine.  (Dkt. 129-3, at 6.)

Dr. Plotkin ordered a follow-up appointment for May 1, 1997.  That appointment was never made.  Indeed, Mr. Suggs did not return until June 27, 1997, at which point Dr. Plotkin asked that Mr. Suggs be examined by neurosurgeon Dr. Fraser Henderson to determine whether surgery would be appropriate.  (Dkt. 129-3, at 5, 7-8.)  As of September 23, 1997, that neurosurgery consultation had still not been completed and so Dr. Plotkin recommended it again "in order to assess whether laminectomy at C2-3 may forestall further functional loss."  (Dkt. 129-3, at 9.)  Despite Symbral's promise to schedule "all

medical appointments within one month," and despite the MRDDA case manager's duty to ensure that these appointments were scheduled, Mr. Suggs's neurosurgery appointment was not scheduled until November 11, 1997. (Dkt. 129-3, at 10.)

On November 11, 1997, Dr. Henderson, a Georgetown University neurosurgeon, examined Mr. Suggs and recommended that a laminectomy, which is a surgical procedure to remove bone compressing the spine, be performed "in the next few weeks" to relieve pressure on Mr. Suggs's spinal cord. (Dkt. 129-5, at 4.) On December 16, 1997, Dr. Plotkin recommended proceeding with the laminectomy "ASAP." (Dkt. 129-3, at 10.)

Instead of scheduling the surgery as recommended, Mr. Suggs's Team waited four months, then decided at a meeting on March 19, 1998 that they should get a second opinion. (Dkt. 129-6, at 2; Dkt. 130-7, at 11.) On May 22, 1998 and August 12, 1998, Symbral took Mr. Suggs to Howard University Hospital for neurology visits, but neglected to request a second opinion regarding the recommended neck surgery. (Dkt. 129-7, at 3-9; Dkt. 129-9, at 2-4.) Mr. Suggs's Team did not obtain a second opinion until April 30, 1999, when Dr. Mills at Howard University Hospital confirmed the need for the recommended cervical laminectomy. (Dkt. 129-8, at 2.)

19

It was not until 1999 that anyone contacted Mr. Suggs's sister, Carrie Weaver,

in South Carolina to discuss the surgery first proposed in 1997.  Additionally,

Symbral failed to have a neurosurgeon speak with her to explain the risks and

benefits of the surgery.  Instead, Kendall LaRose, Symbral's residential

coordinator who had no medical training, called Ms. Weaver to discuss the

recommended surgery.  (Dkt. 128-13, at 10, 12-13.)   Mr. LaRose mailed to Ms.

Weaver a form that read in relevant part as follows: "I hereby decent [sic] to have

the surgical procedure completed to address the Cervical Spinal Cord

Compression caused by Cerebral [sic] Stenosis.  I don't believe that Curtis would

not gain [sic] an improvement in his quality of life and the that [sic] procedure

may hasten his demise." (Dkt. 132-9, at 2.)   In August 1999, Ms. Weaver

declined to consent to the surgery because no one explained to her how or why

surgery would benefit Mr. Suggs.  (Dkt. 129-10, at 2-6; Dkt. 129-11, at 5.)  Under

the District's medical-consent policy from 1995 to 1999, however, District

officials could have consented to the surgery on Mr. Suggs's behalf without Ms.

Weaver's consent.  (Dkt. 129-12, at 3.)  In fact, the MRDDA administrator

routinely signed consent forms for other surgical procedures for Mr. Suggs.  (Dkt.

131-11, at 2-5.)

    Mr. Suggs was next evaluated in December 1999 by a neurosurgeon at

Providence Hospital, who concluded in a report dated March 2, 2000 that at that

time surgery was unlikely to have any meaningful impact on Mr. Suggs's motor function or neurological status because of his prolonged deficit over several years. (Dkt. 120-3, at 52.) The laminectomy was never performed.

The untreated spinal-cord compression caused Mr. Suggs to suffer a precipitous loss of health. He gradually lost the ability to use his arms, to walk, to feed himself, and even to chew and safely swallow his food. (Trial Tr. 46-48, Apr. 16, 2012). His inability to chew and his loss of mobility led to malnutrition, dehydration, aspiration of food particles into his lungs, and pneumonia. (Trial Tr. 49, Apr. 16, 2012; Trial Tr. 57-58, 123-24, Apr. 11, 2012). He also became incontinent and suffered severe constipation because he could not move his bowels. (Trial Tr. 47-48, Apr. 16, 2012).

Mr. Suggs's incontinence, lack of mobility, and inability to use his arms led to the development of numerous pressure sores on various parts of his body. These are painful areas that are unable to heal without adequate nutrition and hydration and are painful because loss of skin exposes nerve endings. (Trial Tr. 23, 32, 35, 39-40, Apr. 12, 2012; Trial Tr. 50-51, Apr. 16, 2012). The ulcer on Mr. Suggs's hip had to be surgically cleaned and repaired, which required cutting off necrotic tissue, cutting healthy tissue, chiseling through to the bone, and then sewing up the surgery site. Mr. Suggs was left in pain and cried and moaned for days following the surgery. (Trial Tr. 78-81, 82-86, Apr. 12, 2012).

Mr. Suggs's cervical compression gradually caused his diaphragm to become paralyzed, which led to his inability to breathe and necessitated five hospitalizations between 1995 and 2000 for respiratory failure, pneumonia, fecal impaction, and dehydration. Mr. Suggs's bowel moved into his chest and lung area because the diaphragm was not strong enough to hold. The hospitalizations became more serious until he required a breathing mask, a ventilator, and a tracheostomy (surgical placement of a breathing tube into his windpipe). On June 30, 2000, Mr. Suggs died from a pneumothorax (collapsed lung) and respiratory cardiac arrest caused by his paralyzed diaphragm and respiratory failure. (Trial Tr. 120-139, Apr. 11, 2012).

## Standards of Review

The grant of summary judgment is reviewed de novo. *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1074 (D.C. Cir. 2014).

The denial of a new trial motion is reviewed for abuse of discretion. *Daskalea v. District of Columbia,* 227 F.3d 433, 443 (D.C. Cir. 2000). A new trial is unwarranted if the trial error was harmless. *See Williams v. United States Elevator Corp.*, 920 F.2d 1019, 1022-23 (D.C. Cir. 1990).

Evidentiary rulings are reviewed for abuse of discretion. *Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013). An erroneous

evidentiary ruling will be reversed only if the error affected a party's substantial rights. *Id.*

The lawfulness of jury instructions is reviewed de novo. *Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 52 (D.C. Cir. 2006). Reversal is warranted only if an error affected the outcome of the district court proceedings. *Czekalski v. LaHood*, 589 F.3d 449, 453-56 (D.C. Cir. 2009).

The determination how to credit a judgment entered upon a jury verdict against a nonsettling defendant with the proceeds a settling defendant paid to the plaintiff is reviewed de novo. *Berg v. Footer*, 673 A.2d 1244, 1247 (D.C. 1996).

An award of attorney's fees is reviewed for abuse of discretion. *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013).

## Summary of Argument

The Court should affirm the judgment, except for the fee award, which should be remanded to correct computational errors.

1.    The district court properly granted summary judgment against the District under the Civil Rights Act for violating Mr. Suggs's constitutional rights. First, the District owed to him a substantive-due-process duty of care. Mr. Suggs was a person with a severe intellectual disability who was incapable of caring for himself and who was involuntarily committed to the District's legal custody. The District restrained his freedom to act on his own behalf by placing him in a group

23

home that was operated by its contractor and from which Mr. Suggs was not free to leave without first obtaining approval from the group-home director or from the court.  Furthermore, Mr. Suggs was a member of the *Evans* class, which, with the District's consent, the *Evans* court held has due-process rights to care, treatment, and freedom from harm.

Second, the District's deliberate indifference to providing medical care to Mr. Suggs shocks the conscience sufficiently to establish a violation of his substantive-due-process rights.  The District's case manager assigned to Mr. Suggs utterly failed to fulfill her obligations to visit him quarterly, to monitor the services provided to him, and to ensure that all medical appointments and other appropriate care were provided.  For several years after he exhibited symptoms of a serious medical condition, many medical appointments were inordinately delayed or were missed altogether, and the treatment recommended by several physicians was never provided.  Consequently, Mr. Suggs lost motor function, endured deteriorating health, was subjected to multiple hospitalizations, experienced acute pain and suffering, and ultimately died.

Third, the *Evans* case has made abundantly clear that the District's persistent and pervasive practice of disregarding the needs — including medical needs — of class members such as Mr. Suggs was so widespread and longstanding as to constitute a custom of deliberate indifference to the risk that it would infringe

24

class members' constitutional rights.  That deplorable custom — including the failure of the District's case managers to visit their clients quarterly, to monitor the care provided to their clients, and to ensure that their clients received necessary medical care — was the moving force behind the violation of Mr. Suggs's due-process right to medical care.

The district court also properly granted summary judgment against the District on the negligence claims.  The presuit notices satisfied the requirements of D.C. Code § 12-309.  By stating that the District's negligent monitoring of Mr. Suggs's condition and failure to provide proper medical care caused his injuries, including pressure sores, pain, and death, the notices provided enough information to enable the District to conduct a prompt and properly focused investigation, which is all the notice statute requires.  The District can hardly complain about the district court's ruling limiting the recovery of monetary damages under the common-law negligence claim to the period after December 23, 1999, since that is precisely what the District urged.  Nor did the district court err in ruling that the District's negligence was sufficient to establish liability under the intellectual-disabilities-rights statute, given that the statute expressly imposes liability for negligence. And the district court's finding of negligence was adequately supported by the evidence from two well-qualified experts who were familiar with the national

25

standard of care and who identified the District's specific violations of the standard.

2.      The district court did not abuse its discretion in denying the District's motion for a new trial.  The court properly excluded the District's causation evidence because, among other things, the District never designated a causation expert.  The so-called decision against surgery could not be a superseding cause of Mr. Suggs's damages because the District's case manager participated in that decision and a defendant's own conduct cannot constitute a superseding cause. Nor was the alleged refusal of Mr. Suggs's sister to consent to the surgery a superseding cause; her refusal was readily foreseeable because no health-care personnel explained to her the benefits of the procedure, and conduct that is foreseeable cannot be a superseding cause.  Similarly, the group home's negligent failure to prevent the pressure sores was not a superseding cause because it was foreseeably within the scope of the risk created by the District's negligent failure to ensure that Mr. Suggs's spinal-cord compression was properly treated, which resulted in his loss of motor function and concomitant susceptibility to pressure sores.  Contrary to the District's assertions on appeal, the district court did permit its counsel to extensively cross-examine Mr. Suggs's experts on alternative causes of his health problems.  The district court did not abuse its discretion in

excluding opinion testimony from a treating physician because the District never made the required disclosures about his opinions.

A new trial was not warranted by the district court's jury instruction that any damages award may be subject to a claim by the District for repayment of the cost of care it provided to Mr. Suggs.  That instruction was no more objectionable than the standard instruction informing juries that certain types of damages may be taxable.  In any event, the instruction was not prejudicial because the court also gave instructions, which the jury is presumed to have followed, that the verdict must be based only on the evidence rather than on speculation and that damages were appropriate only for past injury.

3.  The district court did not err in rejecting the District's claim to a 50% credit on the entire verdict, which provided compensation under the Civil Rights Act. As a private, nonstate actor, the group home could not be held liable as a matter of law under that statute.  Because there is no common liability under the statute, the District has no right of contribution against the group home on the statutory claim, and therefore no right to a 50% credit on the verdict returned on that claim.

4.  In awarding fees and costs, the district court made several computational errors.  This Court should remand for correction of those miscalculations.

## Argument

## 1. Mr. Harvey was entitled to summary judgment on his Civil Rights Act and negligence claims.

### A. The district court properly held the District liable for violating Mr. Suggs's constitutional rights.

Section 1 of the Civil Rights Act of 1871, which is codified at 42 U.S.C.

§ 1983, provides a cause of action for monetary damages and injunctive relief

against "[e]very person who, under color of [law]" deprives another person of

rights protected by the Constitution.  "[A] municipality is a 'person' who can be

held liable under section 1983."  *Daskalea*, 227 F.3d at 441 (citing *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

To establish a municipality's liability under § 1983, a plaintiff must prove "the

violation of a right secured by the Constitution and laws of the United States,"

*West v. Atkins*, 487 U.S. 42, 48 (1988), and that "execution of [the municipality's]

policy or custom . . . inflict[ed] the [plaintiff's] injury," *Monell*, 436 U.S. at 694.

"[A] city's inaction . . . constitutes a 'policy or custom' under *Monell* when it can

be said that the failure amounts to '"deliberate indifference towards the

constitutional rights of persons in its domain."'"  *Daskalea*, 227 F.3d at 441

(quoting *City of Canton v. Harris,* 489 U.S. 378, 388-89 & n.7 (1989); further

citations omitted).  "Deliberate indifference is determined by analyzing whether

the municipality knew or should have known of the risk of constitutional

28

violations, an objective standard." *Baker v. District of Columbia*, 326 F.3d 1302, 1307 (D.C. Cir. 2003) (citation omitted).

### *(1)    The Constitution imposed on the District a duty of care and protection as to Mr. Suggs.*

Mr. Harvey's claim under § 1983 is based on the District's violation of his substantive-due-process rights, secured by the Fifth Amendment to the Constitution, to a safe and secure environment and to freedom from harm.  (Dkt. 2, at 14-16.)  Substantive due process generally requires the State to assume responsibility for the safety and well-being of a person who it takes into its custody and holds against the person's will.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 89 U.S. 189, 199-200 (1989).  More specifically, in *Youngberg v. Romeo* the Supreme Court held that the substantive component of the Fourteenth Amendment's Due Process Clause required the State to provide safe conditions, freedom of movement, and training to an involuntarily committed person with severe intellectual disabilities.  457 U.S. 307, 314-16, 319 (1982).  The Court acknowledged that "the essentials of the care that the State must provide" include "food, shelter, clothing, and medical care."  *Id*. at 324; *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (holding that Eighth Amendment proscribes "deliberate indifference to serious medical needs of prisoners"); *Youngberg*, 457 U.S. at 321-22 ("Persons who have been involuntarily committed are entitled to

more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

The circumstances surrounding the commitment of Mr. Suggs to the District's charge strikingly resemble those of the commitment of the *Youngberg* plaintiff, Mr. Romeo, that the Supreme Court held were sufficient to trigger the state's substantive-due-process duty. Both men had a profound intellectual disability and lacked basic self-care skills. Both lived with their families into adulthood until their families could no longer care for them. Upon petition, and after medical certification that each had an intellectual disability and was unable to care for himself, a court involuntarily committed each man to a state facility. 457 U.S. at 309-10; *see supra* pp. 12-13.

Thus, like Mr. Romeo in *Youngberg*, Mr. Suggs was a person with a severe intellectual disability who was incapable of caring for himself and who was involuntarily committed to a state facility. He "thus enjoy[ed] constitutionally protected interests in conditions of reasonable care and safety." *Youngberg*, 457 U.S. at 324. More specifically, the District owed to Mr. Suggs a substantive-due-process duty to provide safe conditions, freedom of movement, training, and essentials of care, including food, clothing, shelter, and medical care. *Id.* at 314-16, 319, 324. Furthermore, as a former resident of Forest Haven and therefore a member of the *Evans* class (Dkt. 150, at 47; *see also* Dkt. 123, at 25; Dkt. 123, at

30

31), Mr. Suggs had Fifth Amendment rights to habilitative care and treatment and to freedom from harm. *Evans*, 459 F. Supp. at 484.

The District could not and did not relieve itself of its constitutional duty to Mr. Suggs when it transferred him out of Forest Haven in 1983 and into the group home operated by its contractor Symbral in 1984. (Dkt. 130-6, at 2; Dkt. 120-3, at 14-15; Dkt. 150-6, at 360, 371.) *See Smith v. District of Columbia*, 413 F.3d 86, 93-97 (D.C. Cir. 2005) (holding that District owed substantive-due-process duty to juvenile delinquent who court placed with independent-living program operated by District's contractor). "The combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *County of Sacramento v. Lewis,* 523 U.S. 833, 852 n.12 (1998).

Mr. Suggs's formal commitment to the District's legal custody "is a good indicator that it had a duty to look after him. Because the District, rather than [Mr. Suggs's] family, had primary legal control over him, the District had legal responsibility for his daily care." *Smith*, 413 F.3d at 94. He remained a ward of the District after his placement in the group home. (Dkt. 130-2, at 9; Dkt. 130-3, at 3, 5, 7, 11.) The MRDDA administrator was Mr. Suggs's legal guardian. (Dkt. 130-3, at 3, 5, 7, 11.) As the District's counsel acknowledged in 1996 in *Evans*, MRDDA was "the designated agency for the care and habilitation of persons

legally committed to the District of Columbia government" and "[w]hile

MRDDA has contractually delegated the day-to-day responsibility for the care

and habilitation to the ICF/MR providers in the residential system, MRDDA's

responsibility remains unchanged." (Dkt. 128-5, at 3; *see also* Dkt. 128-6, at 4,

10.) As Mr. Suggs's legal guardian, MRDDA, and hence the District, continued

to owe Mr. Suggs a substantive-due-process duty to protect him from harm. Part

of that duty was to ensure that adequate medical care was provided to *Evans* class

members such as Mr. Suggs. (Dkt. 132-7, at 7; Dkt. 128-6, at 5, 7, 10.)

Although the group home may have been less restrictive than Forest Haven,

by placing Mr. Suggs there the District nonetheless had "'restrained his freedom

to act on his own behalf.'" *Smith*, 413 F.3d at 94 (quoting *DeShaney*, 489 U.S. at

200) (alterations omitted). Simply stated, Mr. Suggs was not free to leave. Under

the 1978 Act, he could not be discharged or transferred from the group home

except with the express approval of the court or the group-home director. D.C.

Code §§ 7-1303.08, -1303.09, -1303.10, -1304.11 (2001). The District

hypothesizes that "if he had ever become competent to request his

discharge . . . then his discharge from 'commitment' was mandatory upon such

request." (Br. for Appellant 33-34.) But Mr. Suggs was never going to become

competent. After he was placed in the group home, his intellectual disability

remained profound; his mental age was about 1 year, 7 months; he was

nonverbal; he could not read or write; he was "not legally competent to make decisions" as to his care; he lacked the cognitive skills to understand these decisions and could not give informed consent; he could not advocate for his civil rights and was dependent on his caretakers to protect his rights; and, as a court found in 1985, he "require[d] 24-hour care and supervision for the remainder of his life." (Dkt. 131-5, at 6, 11, 12; Dkt. 131-8, at 5, 13, 15, 16; Dkt. 130-3, at 3, 5, 7, 11; Dkt. 130-6, at 3.)

In short, even after the District placed him in the Symbral group home, the District continue to serve as Mr. Suggs's "legal custodian and primary caregiver. It placed him in a program that constrained his liberty by limiting, among other things, where he lived and what he could do." *Smith*, 413 F.3d at 96. Furthermore, Mr. Suggs remained "wholly dependent on the State" to take care of his needs. *Youngberg*, 457 U.S. at 317. He therefore continued to "enjoy[] constitutionally protected interests in conditions of reasonable care and safety." *Id.* at 324. And the District, as his legal guardian, continued to owe him a substantive-due-process duty to provide him those conditions. *See id.* at 314-16, 319, 324; *Lewis,* 523 U.S. at 852 n.12; *Smith*, 413 F.3d at 95 ("[W]here the government assumes full responsibility for a [person] by stripping control from the family and placing the [person] in a government-controlled setting, the government has a duty not to treat the [person] with deliberate indifference.").

33

**(2)     *Mr. Suggs's constitutional right to medical care was violated.***

The first requirement for establishing municipal liability under § 1983 is a "predicate constitutional violation."  *See Baker*, 326 F.3d at 1306.  The constitutional provision at issue here is the substantive component of the Due Process Clause of the Fifth Amendment.  (Dkt. 2, at 14-16.)  "[G]overnmental deliberate indifference will shock the conscience sufficiently" to establish a substantive-due-process violation.  *Smith*, 413 F.3d at 93 (internal quotation marks and citation omitted).

Here, the constitutional harm occurred when Mr. Suggs did not receive needed medical treatment from 1995 until his death in 2000.  The District's deliberate indifference to Mr. Suggs's serious medical condition and resulting precipitous health decline for nearly five years shocks the conscience more than sufficiently to establish a violation of his substantive-due-process rights.  In furtherance of the District's obligation to ensure that adequate medical care was provided to Mr. Suggs, MRDDA case manager Sarah Jenkins was required to make quarterly visits to Mr. Suggs to monitor his care and to ensure that all medical appointments and other appropriate care was provided to him.  (Dkt. 128-5, at 3; Dkt. 128-6, at 6, 7; Dkt. 128-8, at 4, 12-13.)   But in the four years from September 1995 to September 1998, she visited him only eight times, and no case manager visited him at all in 1999.  (Dkt. 130-7, at 4-12; Dkt. 128-6, at 10.)  Her

neglect caused inordinate delays in scheduling recommended medical appointments and deprived Mr. Suggs of the care and treatment he so desperately needed.

By September 1995 Ms. Jenkins knew that Mr. Suggs's physical condition was deteriorating, specifically that he had lost strength in his arms and had become dependent on staff to feed him. (Dkt. 130-7, at 4-5; Dkt. 131-6, at 2-5, 12.) She also knew that his day-program physical therapist had recommended a neurology consultation to determine the cause of the deterioration. (Dkt. 128-14; Dkt. 130-7, at 5.) Six months later, Ms. Jenkins again noted the recommendation, which had not been implemented. (Dkt. 130-7, at 6.) At Mr. Suggs's Plan meeting in August 1996, UCP reiterated its neurology-evaluation recommendation, and Ms. Jenkins acknowledged the need to investigate Mr. Suggs's physiological condition, but she improperly omitted the recommendation from his 1996 Plan. (Dkt. 129-1; Dkt. 130-7, at 7; Dkt. 131-7; Dkt. 128-6, at 14.) Only after UCP notified Symbral and Ms. Jenkins that the neurology-evaluation recommendation was missing from Mr. Suggs's 1996 Plan, and the Department of Consumer and Regulatory Affairs issued a deficiency notice to Symbral for failing to promptly schedule the consult in 1995, was the neurology appointment scheduled for March 7, 1997 — 543 days after the recommendation. (Dkt. 129-1; Dkt. 129-2, at 2-9.)

35

Although Symbral committed to "making all medical appointments within one month of recommendation" (Dkt. 129-2, at 5, 7), Ms. Jenkins consistently failed to ensure that Mr. Suggs's appointments were promptly made or kept.

The neurologist suspected that cervical stenosis was causing Mr. Suggs's decreased muscle tone, decreased use of his upper extremities, inability to feed himself, and inability to ambulate anymore, so on March 7, 1997 he recommended that an X-ray and MRI be taken of Mr. Suggs's cervical spine "ASAP." (Dkt. 129-3, at 3-5.) But the recommended MRI, which did show severe stenosis of Mr. Suggs's cervical spine, was not conducted until April 18, 1997 ─ 43 days after the recommendation. (Dkt. 129-3, at 6.) Although the neurologist ordered a follow-up appointment for May 1, 1997, Mr. Suggs was not brought back till June 27, 1997 ─ a delay of 58 days. (Dkt. 129-3, at 5, 7-8.) The neurologist requested that Mr. Suggs be seen by a neurosurgeon to determine whether surgery would be indicated (Dkt. 129-3, at 7-9), and Ms. Jenkins knew of that referral by July 31, 1997 (Dkt. 130-7, at 9), but the appointment with the neurosurgeon did not occur until November 11, 1997 ─ 138 days after the request. (Dkt. 129-3, at 10; Dkt. 129-5, at 3-4.)

The neurosurgeon recommended that a surgical procedure to relieve pressure on Mr. Suggs's spinal cord be performed "in the next few weeks." (Dkt. 129-5, at 4.) On December 16, 1997, the neurologist recommended that the surgery "be

36

scheduled ASAP." (Dkt. 129-3, at 10.)  Four months later, however, Mr. Suggs's

Team decided to get a second opinion.  (Dkt. 129-6, at 2; Dkt. 130-7, at 11.)  In

May and August 1998, Symbral took Mr. Suggs to a hospital for neurology visits,

but did not request a second opinion regarding the recommended neck surgery.

(Dkt. 129-7, at 3-9; Dkt. 129-9, at 2-4.)  A second opinion, which confirmed that

Mr. Suggs was a candidate for the recommended surgery, was not obtained till

April 30, 1999 — 408 days after the Team decided to seek a second opinion, 536

days after the first neurosurgeon recommended that surgery be performed in a

few weeks, and 1,326 days after Mr. Suggs's functional decline was first noted.

(Dkt. 129-8, at 2.)  District officials could have consented to the surgery on Mr.

Suggs's behalf.  (Dkt. 129-12, at 3; *see also* Dkt. 131-11.)  Nevertheless, as the

District admitted at trial, the surgery was never scheduled, and Mr. Suggs's

untreated cervical stenosis paralyzed his diaphragm, causing his death on June 30,

2000.  (Trial Tr. 30, 121-22, 138, Apr. 11, 2012.)

    In short, for over four years Ms. Jenkins repeatedly failed to vigilantly monitor

the provision of services necessary to ensure that Mr. Suggs's medical condition

was properly diagnosed and treated.  Medical appointments were not scheduled in

a timely fashion, some were missed, and physicians' recommendations were

consistently ignored.  Recommended medical procedures that should have taken

no more than days or weeks to implement instead took months or years, or were

not implemented at all.  Consequently, for almost five years nothing was done to treat Mr. Suggs's cervical stenosis or to relieve him from its disabling and painful sequelae.  The extraordinary delays attendant to Ms. Jenkins's dereliction of the duty to ensure the delivery of recommended medical care to Mr. Suggs were tantamount to a denial of care.  Ms. Jenkins's repeated failure to make sure that Mr. Suggs received the care that he needed constituted deliberate indifference to his serious medical needs that sufficiently shocks the conscience to establish a violation of his substantive-due-process rights under the Fifth Amendment.

The District argues that Mr. Harvey failed to show that an official was subjectively deliberately indifferent to Mr. Suggs's medical needs.  (Br. for Appellant 34.)  But the District is applying the wrong standard.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), on which the District relies, is inapposite for at least three reasons.  First, that case involved a claim for official liability whereas this case involves a claim for municipal liability.  The deliberate indifference that must be proved to establish official liability is measured by a subjective standard, *id.* at 837-38, whereas the deliberate indifference that must be proved to establish municipal liability is measured by an objective standard, *Baker*, 326 F.3d at 1307.

Second, municipal liability under § 1983 is not contingent on the liability of an official or any municipal employee.  *See Thomas v. Cook Cnty. Sheriff's Dep't*,

604 F.3d 293, 305 (7th Cir. 2009); *Speer v. City of Wynne*, 276 F.3d 980, 985-86 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.") (citation omitted).  As this Court has noted, "[i]n order to establish the predicate [constitutional] violation [for a claim of municipal liability under § 1983], neither District of Columbia policy makers nor employees need be implicated."  *Baker*, 326 F.3d at 1306.

Third, the *Farmer* standard of subjective deliberate indifference was adopted to determine whether a prison official's conduct amounts to cruel and unusual punishment of a convicted inmate in violation of the Eighth Amendment. *Farmer*, 511 U.S. at 828, 832-47.  Mr. Suggs, however, committed no crime, was never convicted, was not imprisoned, and deserved no punishment.  Rather he was involuntarily civilly committed because of his inability to care for himself due to his profound disabilities.  Applying to Mr. Suggs's substantive-due-process claim the standard governing cruel-and-unusual-punishment claims would run afoul of the principle that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  *Youngberg*, 457 U.S. at 321-22; *see also id.* at 316 ("the involuntarily

39

committed . . . may not be punished at all"); *Patten v. Nichols*, 274 F.3d 829, 838 (4th Cir. 2001) ("'To apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous.'") (quoting *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3rd Cir. 1987)).

In any event, the facts of this case satisfy the *Farmer* standard, under which an official is deliberately indifferent if she "knows that [a confined individual] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. First, Mr. Suggs faced a substantial risk of serious harm. A neurologist and two neurosurgeons diagnosed his cervical stenosis and resulting spinal-cord compression as the cause of his decreased muscle tone, decreased use of his extremities, inability to feed himself, inability to ambulate anymore, and urinary incontinence, and they recommended surgery as soon as possible to forestall further functional loss. (Dkt. 129-3, at 4, 5, 7-10; Dkt. 129-5, at 3-4; Dkt. 129-8, at 2.) *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (citations omitted) (holding that a medical need is "serious" if it, among other things, "has been diagnosed by a physician as mandating treatment," "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," "untreated could result in further significant injury or the unnecessary and wanton infliction of pain," or "significantly affects an individual's daily activities") (internal quotation marks

40

and citations omitted).  The cervical stenosis eventually caused paralysis of Mr.

Suggs's diaphragm and ultimately was a proximate cause of his death.  (Trial Tr.

121-22, 138, Apr. 11, 2012.)

Second, Ms. Jenkins knew that Mr. Suggs faced a substantial risk of serious

harm.  As early as September 1995, she was aware that he had experienced a

"noted motor decline," that he had lost muscle tone, that simply moving his hand

had become very difficult, and that he needed a neurology evaluation.  (Dkt. 129-

1, at 3; Dkt. 130-7, at 4-5.)  The 1995 Plan, which she approved, documented that

Mr. Suggs had lost upper-extremity strength, which led to reduced food intake.

(Dkt. 131-6, at 2, 12.)  In March 1996, Ms. Jenkins confirmed her awareness of

the recommendation for a neurology evaluation.  (Dkt. 130-7, at 6.)  In August

1996, she documented the need to investigate Mr. Suggs's physiological

condition.  (Dkt. 130-7, at 7.)  In July 1997, she noted his loss of muscle activity

and muscle tone, the narrowing of his spine, and the need to refer him for possible

surgery to relieve pressure on his cervical spine.  (Dkt. 130-7, at 9.)  In March

1998, Ms. Jenkins recognized the "problem of loss of function in Mr. Curtis' [sic]

arms," acknowledged that neurological evaluations revealed "craniocervical

stenosis [with] pressure on the spine near the neck area," and noted that the Team

agreed that "a second opinion was necessary because surgery was involved,"

which means she knew that physicians had recommended surgery to treat the

41

stenosis.  (Dkt. 130-7, at 11.)  And in July 1998, she documented the need to "continue to follow up with [the] neurologist in reference to [the] medical concern."  (Dkt. 130-7, at 12.)

Third, Ms. Jenkins disregarded the substantial risk of serious harm to Mr. Suggs by failing to take reasonable measures to abate it.  She repeatedly and callously neglected to perform her duty of ensuring that medical appointments recommended to evaluate, diagnose, and treat Mr. Suggs's condition were scheduled or kept in a reasonably timely fashion, resulting in exorbitant and inexcusable delays: eighteen months for the initial neurological evaluation, six and one-half months to be seen by a neurosurgeon, four months to decide to get a second opinion, and thirteen and one-half months to get a second opinion.  Furthermore, although the neurologist and the neurosurgeons who rendered the first and second opinions all recommended prompt surgery, the surgery was never done.  Over the fifty-seven months between the recommendation for a neurological evaluation and Mr. Suggs's death, neither Ms. Jenkins nor her successor as the District's case manager took appropriate steps to relieve him from the symptoms and consequences of his cervical stenosis.  This constitutes conscience-shocking deliberate indifference.  *See Johnson v. Karnes*, 398 F.3d 868, 876 (6th Cir. 2005) (holding that failing to promptly schedule surgery demonstrates disregard of risk from delaying surgery and supports finding of

42

deliberate indifference); *accord Reed v. Cameron*, 380 F. App'x 160, 162-63 (3d Cir. 2010).

None of the District's other arguments refutes the conclusion that its case manager violated Mr. Suggs's constitutional rights. Noting that in September 1995 a UCP physical therapist recommended obtaining a neurological consultation "to determine the cause of apparent increased weakness at Mr. Suggs' limb girdles" (Dkt. 128-14, at 2-3), the District asserts that "there is no evidence to whom this recommendation was made or that Ms. Jenkins had learned of it before March 1996." (Br. for Appellant 35.) In fact, however, the record shows that the recommendation was made that same month to the Team, of which Ms. Jenkins was a member. When the recommendation was neither implemented for over a year nor included in the 1996 Plan, UCP wrote a letter stating that the written recommendation "was included in Mr. Suggs'[s] 9/14/95 IHP." (Dkt. 129-1, at 3.) As a member of Mr. Suggs's Team, Ms. Jenkins participated in the Plan meeting of September 14, 1995 and approved the Plan. (Dkt. 131-6, at 2-5.) Her contemporaneous notes document his "lack of or loss of muscle tone," observe that "moving his hand is very difficult," and state that "Neurology [unintelligible] evaluation to be done." (Dkt. 130-7, at 4-5.) So, contrary to the District's denials, by mid-September 1995 Ms. Jenkins knew of

the decline in Mr. Suggs's functional abilities and knew of the recommendation for a neurological consultation.

The District further ignores the record by attempting to excuse Ms. Jenkins's failure to document her response to the recommendation by claiming that "case managers would report 'mainly orally' to the group homes when needed." (Br. for Appellant 35.)  But the very page of the record cited by the District demonstrates that the procedure was for the case manager "to make a *written document*, at least on the monitoring tool, of a service or a recommendation that hadn't been done yet" and "share the copy of the monitoring tool with that concern to the [group-home] provider." (Dkt. 128-8, at 5 (emphasis added).) Standard procedure also required the case manager to document in her case-action notes if she observed a problem that was not being taken care of. (Dkt. 128-8, at 5.) There is no evidence of any effort by Ms. Jenkins — in writing or orally — to ensure that the recommended neurological evaluation was carried out. Indeed, as the District acknowledges (Br. for Appellant 37), the evaluation was not scheduled until after the Department of Consumer and Regulatory Affairs issued a deficiency report. (Dkt. 129-2, at 2-9.) But it was Ms. Jenkins's "primary responsibility" to see to it that Mr. Suggs received all recommended services, including medical ones. (Dkt. 128-5, at 3; Dkt. 128-6, at 6, 7; 128-8, at 12-13.)

44

She failed to fulfill that responsibility, so the neurological evaluation did not take place for eighteen months after it had been recommended.

The District cites to a physical therapist's evaluation dated July 10, 1996, which states that "in recent years there [h]as been a gradual decline in upper extremity functional abilities which have not been fully explained. The small gains and losses are most likely age-related or consumer determined." (Dkt. 120-3, at 24 (capitalization altered).) The District's reliance on this document, however, is misplaced. First, the physical therapist's acknowledgment that Mr. Suggs's functional decline had not been fully explained reinforced the need for a neurological consultation so that a medical specialist could properly diagnose, rather than a physical therapist merely speculate about, the cause of the decline. Second, there is no evidence that either Ms. Jenkins or the rest of Mr. Suggs's Team ever even considered the July 1996 evaluation. Third, the existence of the July 10, 1996 evaluation cannot explain or excuse Ms. Jenkins's complete failure to ensure that UCP's September 1995 recommendation for a neurological consultation was carried out during the ten months before the July 1996 physical-therapy evaluation, her failure to include the unimplemented recommendation in the 1996 Plan even though UCP reiterated the recommendation at the August 1996 Plan meeting, and her failure to ensure that the recommendation was carried

45

out for almost seven months after that meeting.  These are among the failures that demonstrate her deliberate indifference to Mr. Suggs's medical needs.

The District inaccurately asserts that "there is no evidence that [Mr. Suggs's] team recommended a neurology consultation when it met in August 1996."  (Br. for Appellant 36.)  In fact, the record shows that "UCP continued to make this recommendation at [Mr. Suggs's] 8/22/96 IHP meeting, [and] a copy of the PT/OT consult[, which contained the recommendation] was also submitted at his 8/22/96 IHP meeting."  (Dkt. 129-1, at 3; *see also* Dkt. 129-2, at 7-8.)  Indeed, Ms. Jenkins attended that meeting, and the Record of Case Actions for that date, cited by the District, includes her notation under the heading "Recommendations & Issues":  "Investigate physiological condition."  (Dkt. 131-7, at 4, 5; Dkt. 130-7, at 7.)

Trying to turn a vice into a virtue, the District argues that because the recommendation for a neurological consultation was not included in the 1996 Plan, Ms. Jenkins was not deliberately indifferent for failing to ensure that the recommendation was implemented.  (Br. for Appellant 36.)  But the District's corporate designee testified that case managers were required to participate in the Plan meetings and "make sure all the individual's needs are being addressed and the recommendations are being captured into the IHP."  (Dkt. 128-8, at 9.)  Contrary to the District's assertion that "[t]he role of the case manager was not to

46

develop the IHP" (Br. for Appellant 36), the job description for case managers listed among the major duties and responsibilities: "Coordinates and monitors the development and implementation of IHPs." (Dkt. 128-9, at 2.)  Thus Ms. Jenkins's failure to ensure that the neurology-consultation recommendation was included in the 1996 Plan — which contributed to the 543-day delay in implementing the recommendation — further evinces her deliberate indifference because it shows that she did not take reasonable measures to abate Mr. Suggs's serious medical condition, which by then she knew was significantly affecting his daily activities. *See Gutierrez*, 111 F.3d at 1373.

The record does not support the District's contention that the delays in Mr. Suggs's medical appointments between the neurological evaluation in March 1997 and the neurosurgeon's recommendation for surgery in November 1997 would not have been obvious to Ms. Jenkins.  (Br. for Appellant 37.)  For example, although all medical appointments were supposed to have been made within one month after they were recommended (Dkt. 129-2, at 7), on June 27, 1997, the neurologist recommended that Mr. Suggs be seen by a neurosurgeon to determine whether surgery would be indicated (Dkt. 129-3, at 7-9), Ms. Jenkins knew of that referral by July 31, 1997 (Dkt. 130-7, at 9) — more than thirty days after the recommendation —  and the appointment did not occur until November 11, 1997 — 138 days after the recommendation (Dkt. 129-5, at 3-4).

47

The Team's decision to obtain a second opinion about the surgery does not disprove Ms. Jenkins's deliberate indifference to Mr. Suggs's health arising from her repeated failures to remediate the delays in carrying out his recommended medical appointments.  Indeed, the delays surrounding that decision demonstrate deliberate indifference.  The decision, which Ms. Jenkins participated in making, did not occur until more than four months after the first neurosurgeon recommended that the surgery be performed "within the next few weeks" and more than three months after Mr. Suggs's neurologist recommended proceeding with the surgery "ASAP."  (Dkt. 129-5, at 4; Dkt. 129-3, at 10; Dkt. 130-7, at 11.)  The second opinion was not obtained for more than thirteen months after the decision to get it (Dkt. 129-8, at 2), and although it confirmed the first opinion recommending the surgery, it was never carried out.  These protracted delays in obtaining the second opinion and the failure to follow it cast serious doubt on the bona fides of the decision to get a second opinion and further support a finding of deliberate indifference.

Although the District argues that its officials were not deliberately indifferent for failing to provide Mr. Suggs the laminectomy, the district court made clear that "the District's deliberate indifference occurred long before the IDT decided not to obtain a laminectomy for Mr. Suggs—it took place during periods of inaction from 1995 through 1998 in which the District failed to properly

48

supervise the provision of medical care to Mr. Suggs for health issues related to

his cervical stenosis, resulting in substantial delays in scheduling recommended

appointments for medical consultations, follow-ups, and second opinions." (Dkt.

196, at 7.) The District's assertion that the Team's decision against the

laminectomy was reasonable in light of Ms. Weaver's refusal to consent defies

logic because the Team made the decision the year before Ms. Weaver was

contacted about the surgery. (Dkt. 129-10, at 3-6.) Furthermore, her refusal to

consent was not an informed judgment because the person who contacted her had

no medical training, sent her an incomprehensible form to sign, and did not

explain to her the benefits of the surgery, which is why she declined to consent.

(Dkt. 128-13, at 10, 12-13; Dkt. 129-10, at 2-6; Dkt. 129-11, at 5; Dkt. 132-9, at

2; *compare* Dkt. 150-5, at 8 (confirming that she consented to other surgeries

after speaking with Mr. Suggs's medical-care providers).) In any event, Ms.

Weaver's lack of consent is a red herring because even without it the MRDDA

administrator, as Mr. Suggs's legal guardian (Dkt. 131-6, at 15), could have

consented to the surgery (Dkt. 129-12, at 3), as the administrator had done for

other medical procedures, including invasive surgeries (Dkt. 131-11, at 2-5).

Finally, that a third neurosurgeon concluded in March 2000 that a laminectomy

would not significantly improve Mr. Suggs's health can hardly shield the District

from liability in light of his analysis that Mr. Suggs's "deficit over several years"

was so "prolonged" that "it is unlikely that any decompression of the [spinal]

court will have any meaningful impact on his motor function." (Dkt. 120-3, at

52.)  In other words, by then it was simply too late.  The numerous delays caused

by the District's deliberate indifference to Mr. Suggs's serious medical condition

rendered the disabling and painful condition irreversible and condemned him to

death from that condition.

*(3)*     ***The District's custom of deliberate indifference to the needs of Evans
          class members was the moving force behind its violation of Mr. Suggs's
          constitutional rights.***

A municipality can be held liable under § 1983 if it has a custom or policy that

is the "moving force" behind the violation of the plaintiff's constitutional rights.

*City of Canton v. Harris*, 489 U.S. 379, 389 (1989) (internal quotation marks and

citations omitted); *accord Baker*, 326 F.3d at 1306.  This custom or policy may be

established by "the failure of the government to respond to a need (for example,

training of employees) in such a manner as to show 'deliberate indifference' to

the risk that not addressing the need will result in constitutional violations."

*Baker*, 326 F.3d at 1306 (citing *Harris*, 489 U.S. at 390) (further citation

omitted).  "Deliberate indifference is determined by analyzing whether the

municipality knew or should have known of the risk of constitutional violations,

an objective standard." *Baker*, 326 F.3d at 1307 (citation omitted).

As the *Evans* case has made abundantly clear, at the relevant times the District's persistent and pervasive practice of failing to meet the needs of class members, such as Mr. Suggs, who had been involuntarily committed to its care was so widespread and well-settled as to constitute a custom of deliberate indifference to the risk that it would infringe class members' constitutional rights. The District stipulated in *Evans* that its system of support for individuals with developmental disabilities was "broken," "highly dysfunctional," and "unable to execute its mission at its most basic level." *Evans*, 139 F. Supp. 2d at 96-98. Among the problems that the District characterized as "egregious" were the following:

- inadequate training of MRDDA employees and group-home employees;

- inadequate management and oversight of District employees and group-home employees;

- insufficient numbers of case managers to do the work required, effectively precluding them from providing the individualized attention needed by their clients;

- the failure of case managers to visit all their clients at least once per quarter as required by MRDDA policy;

- insufficient monitoring of care provided to MRDDA's clients; and

51

- the frequent denial of necessary health services and medical care to
  class members, sometimes resulting in physical injury.

*Id*. at 97, 100-07; *Evans*, 1996 WL 451054, at \*1-\*2; (Dkt. 131-2, at 3-5, 7; Dkt.
130-1, at 17-47; Dkt. 132-7, at 7; Dkt. 129-16).  The District admitted that these
gross deficiencies violated class members' constitutional rights.  *Evans*, 701 F.
Supp. 2d at 128-29; *Evans*, 459 F. Supp. at 484.

  The District also admitted that "two decades of neglect in the District's system
has taken a toll on the clients served in the system."  *Evans*, 139 F. Supp. 2d at
96.  A 1995 report alerted the District that the deficiencies in the system were
causing "actual and potential harm to class members."  (Dkt. 129-16, at 5.)  The
District of Columbia Auditor found that "MRDDA's system of monitoring is
placing clients at risk."  (Dkt. 131-2, at 3-5, 7.)  The Deputy Mayor confirmed the
District's awareness of reports that medical treatment for group-home residents
had been withheld or delayed with sometimes fatal consequences, and she
acknowledged that the systemic failures may have resulted in "the neglect, abuse,
and death of MRDDA customers."  (Dkt. 130-11, at 5.)

  Thus the uncontradicted evidence overwhelmingly shows that the District's
system of support for persons with developmental disabilities was for decades
grossly deficient and that the District knew of the risk that those failures would
violate the constitutional rights of these persons.  (*See* Dkt. 128, at 57-66; Dkt.

52

150, at 52-53.)  The District entered into multiple consent orders requiring it to

fix the problems in its system, but its repeated noncompliance and, indeed,

intransigence resulted several times in its being held in contempt.  *Evans*, 701 F.

Supp. 2d at 130-47.  The District therefore knew or should have known of the risk

of constitutional violations and failed to rectify it.  This evidence establishes a

custom of deliberate indifference to the needs of *Evans* class members, including

Mr. Suggs.  *See Daskalea*, 227 F.3d at 441 (holding that, in female prisoner's

action alleging municipal liability under § 1983, District was deliberately

indifferent to constitutional rights of women prisoners where federal court in

previous class action held District liable for deliberate indifference to sexual

abuse and harassment of women prisoners by correctional officers).

The District now tries to sidestep this evidence of a deliberately indifferent

custom by arguing that District lawmakers enacted a statute in 1979 to protect the

rights of citizens with intellectual disabilities.  (Br. for Appellant 40-41.)  But the

deliberate indifference here was not in the legislature's statutory enactment, rather

it was in the executive branch's conduct of its grossly deficient system of services

for persons with intellectual disabilities.  *See Daskalea,* 227 F.3d at 442-43 ("[A]

'paper' policy cannot insulate a municipality from liability where there is

evidence, as there was here, that the municipality was deliberately indifferent to

the policy's violation.") (citing *Ware v. Jackson Cnty.,* 150 F.3d 873, 882 (8th

Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.")).

The District contends that its agreement to a series of orders in *Evans* shows that it did not have a policy of deliberate indifference. (Br. for Appellant 41.) But those agreements proved hollow because the District repeatedly violated the orders and therefore was frequently held in contempt. *See Evans*, 701 F. Supp. 2d at 130-47; *see also id*. at 168 (noting that the District "has a proven 30-year history of noncompliance"). Actions speak louder than words.

The District also argues that it consented to greater obligations than constitutionally required. (Br. for Appellant 41.) The district court in *Evans*, however, determined that the District was "not in substantial compliance with constitutional requirements." *Id*. at 162-64 (capitalization altered). Furthermore, the District denies that its stipulations in *Evans* were an admission of a policy of deliberate indifference to constitutional rights. (Br. for Appellant 42.) But the district court in *Evans* observed that, in the consent orders, the District "admitted that [it was] still violating class members' constitutional rights." *Id*. at 128-29.

Although the District denies having a custom of deliberate indifference to the constitutional rights of *Evans* class members, it does not contest that the custom was the moving force behind the violation of Mr. Suggs's due-process right to medical care. A significant aspect of the gross deficiencies in the District's

54

developmental-disabilities system was the failure of its case managers to visit

their clients quarterly, to monitor the care provided to their clients, and to ensure

that their clients were not denied necessary medical care. *See supra* pp. 6-12.  In

accordance with that custom, Mr. Suggs's case manager did not visit him

quarterly, did not adequately monitor the care provided to him, and did not ensure

that he received the medical care that his physicians recommended. *See supra* pp.

34-38.  Consequently, his serious medical condition went untreated for years,

resulting in disability, pain, suffering, and ultimately death.  Thus, the District's

custom of failing to monitor and ensure the delivery of medical care was a

substantial factor in bringing about the unconstitutional denial of medical care to

Mr. Suggs.  And in light of those failures, the chain of events leading to Mr.

Suggs's demise ― especially the unconscionable delays in the delivery of

medical care to him and the persistent failure to follow physicians'

recommendations for treatment ― could hardly be said to be "highly

extraordinary in retrospect." *Smith*, 413 F.3d at 103 (internal quotation marks and

citation omitted).

   In short, there was no genuine issue of material fact that the District had a

custom of deliberate indifference to the needs of persons with intellectual

disabilities who had been involuntarily committed to its care and that this custom

was the moving force behind the violation of Mr. Suggs's constitutional right to

55

receive medical care.  The district court therefore properly granted summary

judgment to Mr. Harvey on his § 1983 claim.

## B.    The district court properly granted summary judgment on the negligence claims.

### *(1)    Mr. Harvey's presuit notices complied with the applicable statute.*

In support of its contention that it is entitled to judgment on the negligence and

statutory claims for lack of notice under D.C. Code § 12-309, the District

advances several arguments, but none withstands scrutiny.  The statute bars an

action unless the claimant has given the Mayor "within six months after the injury

or damage was sustained" written notice of "the approximate time, place, cause

and circumstances of the injury or damage."  D.C. Code § 12-309 (2001).   The

statute does not "require[e] notice complete enough to state a formal cause of

action."  *Washington v. District of Columbia*, 429 A.2d 1362, 1368 (D.C. 1981)

(en banc).  Thus "with respect to *the details* of the statement [giving notice],

*precise exactness is not absolutely essential*."  *Id.* at 1365 (internal quotation

marks and citations omitted).  Furthermore, "with respect to the *content* of the

notice, . . .  in close cases [courts] resolve doubts in favor of finding compliance

with the statute."  *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C.

1995).

First, the District's contention that "the failure to promptly diagnose and

surgically correct Mr. Suggs's cervical stenosis . . . was not an injury identified in

the § 12-309 notices" (Br. for Appellant 44-45) is muddled.  That "failure" was

not Mr. Suggs's injury; it was the wrongdoing that gave rise to his injury.  A

notice may satisfy § 12-309 without specifying the District's wrongdoing.  *See*

*Washington*, 429 A.2d at 1363-68.  Nevertheless, one of Mr. Harvey's notice

letters identified the District's wrongdoing as "[n]egligent monitoring of Mr.

Suggs' condition by employees of the District of Columbia."  (Dkt. 123-1, at 39.)

Another notice letter characterized the District's wrongdoing as "mistreatment,

neglect, abuse, substandard living conditions, failure to properly monitor the

group home, [and] failure to provide proper medical care."  (Dkt. 139-3, at 2.)  As

to Mr. Suggs's injuries, the notice letters listed "ongoing pain, dehydration,

sepsis[,] decubitus ulcers" and death.  (Dkt. 123-1, at 39; Dkt. 139-3, at 2.)  The

information contained in these letters was therefore sufficient to give District

officials "reasonable notice" of the District's wrongdoing and Mr. Suggs's

injuries "so that the facts may be ascertained and, if possible, the claim adjusted."

*Washington*, 429 A.2d at 1365 (internal quotation marks and citations omitted).

   Second, the District challenges the timeliness of the notices.  Having failed to

raise that argument in the district court (see Dkt. 123, at 23-25; Dkt. 150, at 40-

43), however, the District has forfeited it.  *See Dyson v. District of Columbia*, 710

F.3d 415, 419 (D.C. Cir. 2013) ("It is well settled that issues and legal theories

not asserted at the District Court level ordinarily will not be heard on appeal.")

(internal quotation marks and citations omitted). Instead the District argued in the district court that Mr. Harvey "cannot recover damages for alleged injuries that occurred to Mr. Suggs before December 23, 1999. Recovery for damages before that date – six months prior to his amended § 12-309 notice – is barred by the statute." (Dkt. 123, at 24-25.) The district court *agreed* with that argument, ruling that "the plaintiff's recovery of monetary damages from the District under his common law negligence claim is limited by § 12-309 to the period from December 23, 1999 through Mr. Suggs's death on June 30, 2000." *Harvey*, 841 F. Supp. 2d at 192. Having prevailed on that point, the District cannot now claim error.

In a single sentence submerged in a footnote, the District asserts that the notices were also inadequate because they omitted the requisite "cause and circumstances." (Br. for Appellant 46 n.3.) But this Court does not consider points adverted to in a perfunctory manner, unaccompanied by developed argumentation. *See Payne v. District of Columbia Gov't*, 722 F.3d 345, 354 (D.C. Cir. 2013). In any event, statements in the notices (Dkt. 123-1, at 39; Dkt. 139-3, at 2) that the District's wrongdoing caused Mr. Suggs's injuries, all as described above, met the statute's "cause and circumstances" requirements because they "provided enough information to enable the District to conduct a prompt, properly focused investigation." *Washington*, 429 A.2d at 1367.

58

*(2)      The District is not entitled to judgment on the statutory negligence claim.*

The District argues that the district court erred in finding the District liable under D.C. Code § 7-1305.14(c) based on negligence.  But the District waived that argument by not raising it in the district court.  *See Dyson*, 710 F.3d at 419.

The argument also fails on the merits.  The statute provides:

> Any person who violates or abuses any rights or privileges protected by this chapter shall be liable for damages as determined by law, for Court costs and for reasonable attorneys' fees. Any person who acts in good faith compliance with the provisions of this chapter shall be immune from civil or criminal liability for actions in connection with evaluation, admission, commitment, habilitative programming, education or discharge of a resident. However, this section shall not relieve any person from liability for acts of negligence, misfeasance, nonfeasance, or malfeasance.

D.C. Code § 7-1305.14(c).  Among the protected rights is "the right to prompt and adequate medical attention for any physical ailments."  *Id*. at 7-1305.05(g). The District contends that the statute imposes a mens rea requirement for liability, but the only authority it cites involved a criminal statute, which is presumed to contain that requirement.  *United States v. Project on Gov't Oversight*, 616 F.3d 544, 549 (D.C. Cir. 2010).  By contrast, this is a civil statute.  It expressly imposes "liability for acts of negligence."  D.C. Code § 7-1305.14(c).  Although it immunizes persons who comply in good faith with specified provisions, those provisions do not include the delivery of medical care, which is the provision at issue here.  Furthermore, one may act in good faith and still be negligent.  *See Chesapeake & Potomac Tel. Co. v. Clay*, 194 F.2d 888, 891 (D.C. Cir. 1952).

59

The District was therefore liable under the statute for its negligence.  In any event, the undisputed facts establish that the District was not merely negligent but also *deliberately indifferent* to Mr. Suggs's medical needs.  *See supra* pp. 40-53. That is more than sufficient to establish culpability under this statute.

**(3)    *The evidence established the District's negligence as a matter of law.***

Contrary to the District's argument, the evidence of record firmly establishes its negligence.  Mr. Harvey's highly qualified standard-of-care expert, Sue A. Gant, has a B.A., M.S., and Ph.D. in fields related to developmental disabilities and has extensive experience, including as a Federal Court Monitor and as a Special Master, in class actions throughout the country involving the deinstitutionalization of persons with disabilities.  (Dkt. 141-1.)  She is familiar with applicable regulations, guidelines, and professional standards related to governmental oversight of group homes for persons with developmental disabilities.  (*See* Dkt. 139-16.)  She opined that the standard of care required the District to do, among other things, the following: (i) ensure that Mr. Suggs received adequate health care and health-care coordination; (ii) provide adequate monitoring of Mr. Suggs to ensure that he was free from harm and had adequate health care; (iii) monitor development and implementation of Mr. Suggs's Plan; (iv) ensure that his medical needs were properly addressed in his Plan; and (v)

take prompt action when it knew that the group home could not meet Mr. Suggs's medical needs. (Dkt. 139-16, at 5-6.)

Corroborating this evidence was the testimony of the District's Rule 30(b)(6) representative, Mary Devasia. With a B.A., an M.A. in Human Services, and twenty-three-years' experience with MRDDA and the Department of Human Services (Dkt. 190-3), she possessed the requisite "knowledge, skill, experience, training, or education" to testify as an expert. Fed. R. Evid. 702. The District designated her to testify about applicable professional standards and the District's obligation to monitor Mr. Suggs's medical needs and ensure timely and adequate delivery of medical care. (Dkt. 190-1, at 8, 10.) She testified that MRDDA case managers were required, among other things, to do the following: (i) visit their clients quarterly, (ii) document the visits, (iii) participate in Team case conferences, (iv) ensure the development of and approve the Plan, (v) ensure that recommendations for medical care were included in the Plan, (vi) monitor implementation of the Plan, (vii) document service delivery on a monitoring tool, (viii) coordinate clients' receipt of services outlined in the Plan, (ix) ensure that clients receive the services outlined in the Plan, (x) ensure that clients receive adequate medical care, (xi) ensure that health-care recommendations are being followed, (xii) inform the provider and the supervisor if Plan recommendations were not carried out and document that on the monitoring tool, (xiii) know about

61

their clients' issues and problems, and (xiv) advocate for their clients. (Dkt. 128-6, at 6-9, 13-14; Dkt. 128-8, at 3-7, 9-13.) She testified that the District followed a standard published by the Accreditation Counsel for Services for Mentally Retarded and other Developmentally Disabled Persons (*see* Dkt. 128-6, at 12), which was the same standard referenced by the district court in *Evans*, 459 F. Supp. at 484-85.

Dr. Gant and Ms. Devasia not only identified the national standard of care but also specified the numerous ways in which the District violated it. (Dkt. 139-16, at 5-6.; Dkt. 128-6, at 7-9, 14.)  The record abundantly demonstrates those violations, which include inexcusable delays, failure to monitor Mr. Suggs's medical condition, and failure to ensure prompt medical treatment for his documented cervical stenosis. *See supra* pp. 16-22.  The District fruitlessly attempts to justify the case manager's breaches of the standard, but its mere conjecture cannot change the underlying fact that the breaches occurred and proximately caused serious harm to Mr. Suggs. *See Haynes v. Williams,* 392 F.3d 478, 485 (D.C. Cir. 2004) ("The possibility that a jury might speculate in the [party's] favor is insufficient to defeat summary judgment.").  Under the undisputed material facts before the district court, summary judgment was therefore fully warranted on the negligence claim.

## 2.     The district court did not abuse its discretion in denying the District's motion for a new trial.

### A.     The district court properly excluded the District's evidence on causation.

The issue of causation in a negligence action generally requires proof through expert testimony. *Lewis v. Washington Metro. Area Transit Auth*., 19 F.3d 677, 679-80 (D.C. Cir. 1994). The District, however, never designated a causation expert. (*See* Dkt. 214-1, at 5.) Accordingly, it cannot now complain that it was unfairly stymied in presenting evidence contesting causation at trial.

Furthermore, none of the District's arguments on causation has merit. First, the Team's alleged "[d]ecision against the laminectomy" (Br. for Appellant 50) — which in fact was merely an agreement to get a second opinion (Dkt. 130-7, at 11) — could not be a superseding cause because the District's case manager was a member of the Team (Dkt. 128-8, at 6-7), and a defendant's own conduct cannot constitute a superseding cause. *See Butts v. United States*, 822 A.2d 407, 418 (D.C. 2003) ("[A] superseding cause is an *act of a third person or other force* which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.") (internal quotation marks and citation omitted).

Nor could Ms. Weaver's alleged refusal to consent be a superseding cause. "An intervening cause will be considered a superseding legal cause that

63

exonerates the original actor if it was so unforeseeable that the actor's negligent conduct, though still a substantial causative factor, should not result in the actor's liability." *Id*. Given that no physician communicated with Ms. Weaver about the laminectomy, no one informed her of the benefits of the procedure, and the form she was sent to sign was incomprehensible (Dkt. 129-10, at 4; Dkt. 129-11, at 5; Dkt. 132-9, at 2), her refusal to consent was not unforeseeable. Moreover, because the District could have consented to the surgery on Mr. Suggs's behalf (Dkt. 129-12, at 3; *see also* Dkt. 131-11, at 2-5), Ms. Weaver's refusal did not *prevent* the District from being liable for the injuries it caused Mr. Suggs.

The District also argues that the trial court erred in excluding evidence showing that Mr. Suggs's health decline was at least partially attributable to his cerebral palsy and scoliosis. To prove that, however, the District was required to present expert testimony, which it could not do because it never designated an expert on this issue. Nevertheless, the Court permitted the District's counsel to extensively cross-examine Mr. Suggs's experts on alternative causes of his health problems. (*See* Trial Tr. 152-60, Apr. 11, 2012; Trial Tr. 22-23, 32-33, 74-75, 81, 87, Apr. 16, 2012.) And in its summation, the District repeatedly argued to the jury based on that expert testimony. (Trial Tr. 27-28, Apr. 18, 2012 (arguing that "there's a lot of evidence in this case which shows that things that Mr. Suggs had were actually related to the cerebral palsy and were not related to the cervical

64

stenosis"); *id*. at 32 (referring to "things that the plaintiff says were due to cervical stenosis, but were actually just a part of the aging process"). The District therefore had an opportunity to present its position on causation and the jury rejected it.

The district court properly excluded Dr. Gersh's opinion testimony because the District failed to comply with Federal Rule of Civil Procedure 26(a)(2)(C), which requires disclosure of the subject matter and a summary of the facts and opinions to which treating physicians are expected to testify. This requirement became effective December 1, 2010 and "govern[ed] in[,] insofar as just and practicable, all proceedings then pending." U.S. Sup. Ct., Order ¶ 2 (Apr. 28, 2010), *available at* http://www.supremecourt.gov/orders/courtorders/frcv10.pdf; *see also* Fed. R. Civ. P. 86(a). It was neither unjust nor impracticable for the District to comply with the rule. The District in fact did so for another potential expert (Dkt. 108) but simply failed to do so for Dr. Gersh. Even when it attempted to list new witnesses just one week before trial, the District omitted Dr. Gersh. (*See* Dkt. 210.) The District's revelation at Dr. Gersh's deposition that it intended to elicit expert testimony from him at trial — eight business days later — would have flouted the applicable rule as well as the scheduling order (Dkt. 107). It also prejudiced Mr. Harvey because it came too late to allow a proper challenge under Fed. R. Evid. 702 to the reliability of Dr. Gersh's opinions and

65

because it unfairly interfered with Mr. Harvey's trial preparation.  *See Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011) (acknowledging that "it is harmful to deprive opposing counsel of the expert's report before his deposition").  Since the District's failure to make the required disclosures was neither substantially justified nor harmless, the district court did not abuse its discretion in excluding Dr. Gersh's expert testimony.  *See* Fed. R. Civ. P. 37(c)(1).  Any prejudice to the District arising from that exclusion was entirely self-inflicted.

Finally, the district court did not err in excluding evidence of Symbral's negligence as a superseding cause of Mr. Suggs's pressure sores.  Under District of Columbia law, "the initial wrongdoer can be held liable to the injured party for the whole loss, including aggravation of the injuries due to subsequent medical negligence [because] medical negligence aggravating the original injury is foreseeably within the scope of the risk created by the original tortious conduct." *District of Columbia v. Wash. Hosp. Ctr.*, 722 A.2d 332, 337 & n.5 (D.C. 1998) (en banc).  Symbral's negligent failure to prevent the pressure sores was not a superseding cause because it was foreseeably within the scope of the risk created by the District's negligent failure to ensure that Mr. Suggs's spinal-cord compression was properly treated, which resulted in his loss of motor function and concomitant susceptibility to pressure sores (Trial Tr. 115, Apr. 11, 2012).

At most, Symbral's negligence was a concurring cause, which does not insulate the District from liability for its own negligence. *See Hicks v. United States*, 511 F.2d 407, 420-21 (D.C. Cir. 1975).

**B.    The district court properly instructed the jury on the District's probate setoff.**

The district court appropriately instructed the jury that any damages award may be subject to a claim by the District for repayment of the cost of care it provided to Mr. Suggs.  (Trial Tr. 64, Apr. 18, 2012.)  This instruction is no more objectionable than the standard instruction that "[a]ny damages [the jury] might award for emotional distress and for all . . . types of harm [other than physical injury or physical sickness] may be taxable."  Standardized Civil Jury Instructions for the District of Columbia, No. 13-1 (rev. ed. 2002).  Both inform the jury of circumstances that may render its damage award less than fully compensatory. They therefore promote the "primary purpose of compensatory damages," which is "to make the plaintiff whole."  *District of Columbia v. Barriteau*, 399 A.2d 563, 566 (D.C. 1979) (internal quotation marks and citation omitted).

The District has failed to show not only that the instruction was erroneous but also that it was prejudicial.  *See* Fed. R. Civ. P. 61.  To establish that the instruction improperly affected the verdict, the District should have — but did not — request a special verdict to identify any portion of the damages award

67

attributable to the probate lien.  *Cf. George Washington Univ. v. Lawson,* 745 A.2d 323, 328-29 (D.C. 2000).  The District therefore cannot demonstrate whether the jury relied upon the instruction in awarding damages.  The record suggests that it did not. The district court instructed the jury that its verdict must be based only on "the evidence in the case" rather than on "speculation or . . . conjecture" and that damages were appropriate only for "past injury that is not speculative."  (Trial Tr. 53, 54, 65, Apr. 18, 2012.)  The jury is presumed to have followed these instructions.  *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010).  The evidence fully justified the damages award, *Harvey*, 941 F. Supp. 2d at 107-08, and the District does not now argue otherwise.  The jury's note proves nothing.  *See United States v. Crawford*, 533 F.3d 133, 141 (2d Cir. 2009) (observing that "a jury note . . . may signify anything from a weighty concern shared by all jurors to a random inquiry by only one").

To the extent that the District is now contending that Mr. Harvey's remarks in summation constituted an impermissible "golden rule" argument, the District did not object on that ground at trial (Trial Tr. 48, Apr. 18, 2012) and therefore failed to preserve the point for appellate review.  *See Hooks v. Wash. Sheraton Corp.*, 578 F.2d 313, 317 (D.C. Cir. 1977).  The summation included permissible remarks about the proper lien instruction.  *See Harvey*, 941 F. Supp. 2d at 105-06.

Thus, neither the instruction nor the summation warrants reversal of the judgment.

### 3. The court correctly applied a $250,000 credit to the judgment against the District.

When a plaintiff settles a tort claim against a defendant whose liability has been judicially established and then prevails at trial against a nonsettling defendant, the nonsettlor is entitled to a pro rata (50%) credit against the verdict. *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 185-89 (D.C. 1990). This credit is "a substitute for the non-settling defendant's actual claim for contribution that persists after the dismissal of the principal claim against a settling defendant." *Id.* at 187. "The right of contribution arises out of a common liability." *Yellow Cab Co. of D.C. v. Dreslin*, 181 F.2d 626, 627 (D.C. Cir. 1950). If there is no common liability because the contribution defendant is immune, for example, under the common law, *see id.* (common-law family immunity), or under a statute, *see Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 123 (D.C. 1992) (exclusivity provision of workers'-compensation statute), then there is no liability for contribution.

Here, the jury awarded $2,900,000 as compensation for the injuries that Mr. Suggs "suffered as a result of the District of Columbia's deliberate indifference to [his] medical needs" (Dkt. 241), in other words, under § 1983. But "as a private,

non-state actor, Symbral cannot be held liable as a matter of law under 42 U.S.C. § 1983." (Dkt. 248, at 7.) Because there is no common liability under § 1983, the District has no right of contribution against Symbral on that claim, and therefore no right to a pro rata credit on the $2,900,000 verdict on that claim.

There was also no common liability because the periods of the District's and Symbral's wrongdoing were not entirely concurrent. The District's deliberate indifference occurred from 1995 to 1999, whereas Symbral's negligence occurred between 1997 and 2000. (Dkt. 248, at 3.) This asynchrony defeats the District's claim to a pro rata credit on the total verdict. Because the District's conduct was more culpable and longer in duration than Symbral's, it would be inequitable to grant the District a 50% credit on the entire verdict. *See Green Leaves Rest., Inc. v. 617 H St. Assoc*., 974 A.2d 222, 238 (D.C. 2009) ("[c]ontribution is governed by equitable principles").

The District was entitled to a pro rata credit only on the $500,000 subset of the total verdict that was attributable to its negligence. The district court properly held that the District should receive a $250,000 credit for the settlement of the negligence claim against Symbral. (Dkt. 248, at 7.) The District was entitled to no more.

70

## 4.     The district court miscalculated the award of attorney's fees and costs.

Upon consideration of Mr. Harvey's motion for an award of attorney's fees and costs under 42 U.S.C. § 1988(b), the district court reduced the request in several respects. *Harvey*, 951 F. Supp. 2d 47.  In doing so, however, the court made the following computational errors:

- In reducing a certain aspect of the fee award, the court erroneously calculated a 50% reduction of $611,692.75 as $363,609.50 instead of as $305,846.38.  *Id*. at 60.

- In reducing the compensation for travel time of paralegal Luca T. Romano, the court miscalculated a 50% reduction of $72.50 as $362.50 rather than as $36.25.  *Id*. at 63.

- The court disallowed certain travel expenses, but miscomputed the reduction as $10,158.67 instead of as $8,114.48.  *Id*. at 70-71.

- The court's reduction of $7,831.57 was mentioned only in the conclusion of the court's memorandum opinion, and the court's summary explanation for it mirrors that for the court's reduction of $30,528.63, which suggests it may be duplicative.  *Id*. at 74.

In light of these mistakes, the court miscalculated the total reduction in Mr. Harvey's request as $564,801.82 rather than as $496,836.69.  *See id*. at 74.  This

71

matter should therefore be remanded to correct the computational errors. *See Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 725 (3d Cir. 1989).

## Conclusion

For these reasons, the Court should affirm the judgment and remand the fee award to correct the computational errors.

Respectfully submitted,

/s/ Marc Fiedler
Marc Fiedler          D.C. Bar No. 413316
KOONZ, MCKENNEY, JOHNSON,
  DEPAOLIS & LIGHTFOOT, L.L.P.
2001 Pennsylvania Ave., N.W.
Suite 450
Washington, D.C. 20006

Harvey S. Williams
WILLIAMS BERTRAM
1666 Connecticut Ave., N.W.
       Suite 250
Washington, D.C. 20009

*Counsel for Appellee & Cross-Appellant*

June 27, 2014

## Certificate of Service

This certifies that on June 27, 2014, electronic copies of this Brief for

Appellee/Cross-Appellant were served through the Court's ECF system on

carl.schifferle@dc.gov and on all other parties.

/s/ Marc Fiedler
Marc Fiedler

## Certificate of Compliance

This certifies that the Brief for Appellee/Cross-appellants' complies with the

type-volume limitation in Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i)

because the brief contains 16,495 words, excluding exempted parts.  This brief

complies with the typeface and type style requirements of Federal Rule of

Appellate Procedure 32(a)(5) and (6) because it has been prepared in a

proportionally spaced type face using Microsoft Word 2007 in 14-point Times

New Roman.

/s/ Marc Fiedler
Marc Fiedler